**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

| | | |
|---|---|---|
| GREG HANEY, AS SELLERS' REPRESENTATIVE OF CARDLAB, INC., | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | **C.A. No. 10851-VCN** |
| | : | |
| BLACKHAWK NETWORK HOLDINGS, INC., | : | |
| | : | |
| Defendant. | : | |

**MEMORANDUM OPINION**


Date Submitted: November 4, 2015
Date Decided: February 26, 2016

Arthur L. Dent, Esquire and Jaclyn C. Levy, Esquire of Potter Anderson & Corroon LLP, Wilmington, Delaware, and Charles L. "Chip" Babcock, Esquire and Maryellen Shea, Esquire of Jackson Walker, L.L.P., Houston, Texas, Attorneys for Plaintiff.

Jon E. Abramczyk, Esquire and D. McKinley Measley, Esquire of Morris, Nichols, Arsht & Tunnell LLP, Wilmington, Delaware, and Everett C. Johnson, Jr., Esquire, J. Christian Word, Esquire, and Christopher J. Fawal, Esquire of Latham & Watkins LLP, Washington, D.C., Attorneys for Defendant.

NOBLE, Vice Chancellor

Plaintiff Greg Haney ("Haney" or "Plaintiff") in his capacity as representative of the selling stockholders ("Seller Representative") of CardLab, Inc. ("CardLab" or "Sellers") brings this action against Blackhawk Network Holdings, Inc. ("Blackhawk") for fraudulent inducement, breach of contract (three counts), breach of the implied covenant of good faith and fair dealing, unjust enrichment, and negligent misrepresentation. Plaintiff seeks reformation of the merger agreement (or in the alternative, imposition of a constructive trust over certain funds held in escrow), damages in compensation for certain monetary losses due to an alleged breach of the merger agreement (and maximum allowable pre- and post-judgment interest), and a judgment requiring Blackhawk to furnish to Plaintiff certain information pursuant to the merger agreement.[1]

## I.    BACKGROUND

Blackhawk is a Delaware corporation that provides gift cards and other prepaid products and financial service products to its customers through a global distribution network.[2] CardLab offers its customers a variety prepaid cards, including retail store gift cards, and by 2013 had supplied prepaid cards to more than 35% of the Fortune 100 companies.[3] During summer 2013, CardLab began negotiations to partner with GameStop Corp. ("GameStop"), a video game,

---

[1] Am. Verified Compl. ("Compl." or the "Complaint") Wherefore clause.
[2] *Id.* ¶ 12.
[3] *Id.* ¶¶ 15, 18.

electronics, and wireless services retailer. The negotiations contemplated that CardLab would provide to GameStop its prepaid cards, which GameStop would then provide to its customers in return for used games and other electronics.[4] During the remainder of 2013 and early 2014, CardLab and GameStop continued negotiations, and by early June 2014, the two companies "contemplated a lucrative contract with an estimated 2015 gross margin of $8.6 million."[5]

On June 16, 2014, Blackhawk's president, Talbott Roche, sent a letter to CardLab offering to purchase CardLab, which CardLab accepted subject to due diligence and further negotiation.[6] The purchase terms included a $25 million cash payment at closing "and a performance-based cash payment of up to $50 million, to be made within 60 days following the end of 2015."[7] The due diligence process persisted from June until August 2014.[8] In early July, Blackhawk requested and received details regarding CardLab's current and prospective clients, including a description of the GameStop contract terms.[9] "Unbeknownst to CardLab . . . , [Interaction Communications International, Inc. ("InComm")]—Blackhawk's largest competitor—had an existing contract with GameStop that contained an

---

[4] *Id.* ¶ 20.
[5] *Id.* ¶¶ 21-22.
[6] *Id.* ¶ 23.
[7] *Id.* The Complaint notes that CardLab saw this offer as attractive based on its confidence in the GameStop contract, which would help achieve the performance-based earnout payment. *Id.* ¶ 24.
[8] *Id.* ¶ 26.
[9] *Id.*

exclusivity clause which specifically prohibited GameStop from selling, distributing or marketing Blackhawk products" (the "Exclusivity Provision").[10] Haney alleges that Blackhawk and its executives were aware of the Exclusivity Provision because "Blackhawk had similar exclusivity clauses, and Blackhawk has since admitted to members of [CardLab] that this type of exclusivity provision was standard among industry competitors."[11] Therefore, Haney concludes, Blackhawk knew and failed to disclose to Sellers that consummation of the merger between InComm and Blackhawk would preclude CardLab from finalizing its previously negotiated contract with GameStop, at least until expiration of the exclusivity period in August 2015.[12]

Instead of disclosing the exclusivity conflict with GameStop, the Complaint continues, in early August 2014, Blackhawk concealed and capitalized on the information by revising the payment structure of the August 27, 2014 Agreement

---

[10] *Id.* ¶ 27.

[11] *Id.* (footnote omitted). The Complaint continues that "[t]here is no doubt that [Blackhawk and InComm] were acutely aware of the details of each other's business relationships." *Id.* ¶ 27 n.12. Haney bases this conclusion on allegations that "it is industry practice to closely monitor competitors' activities," citing a 2009 lawsuit between InComm and Blackhawk in which InComm described its relationship with Blackhawk as "fierce" and "direct," stating that the two companies "often compete for the same customers within the same industry, providing similar, if not identical, types of products and services." *Id.* (internal quotation marks omitted).

[12] *Id.* ¶ 28.

and Plan of Merger (the "Merger Agreement").[13] The revised Merger Agreement authorized Blackhawk to "withhold $2.5 million from the cash payable at closing and place that amount in escrow until GameStop signed the contract, completed the pilot program, and gave notification of its intent to proceed with the chain-wide rollout of CardLab's prepaid cards."[14] CardLab, still without knowledge of the Exclusivity Provision, agreed to the revision on the condition that CardLab receive a full year of the GameStop earnout.[15] Blackhawk, through Jerry Ulrich (Blackhawk's Chief Financial Officer and Chief Administrative Officer), agreed to CardLab's condition provided that the GameStop contract commenced no later than April 1, 2015, and reiterated Blackhawk's expectation that the GameStop deal would proceed without delay.[16] Based on Blackhawk's assurances, CardLab and

---

[13] *Id.* ¶ 29.

[14] *Id.* The revisions contemplated that Blackhawk would pay CardLab "$1.25 million if the GameStop contract was signed by December 31, 2014, and another $1.25 million upon written notice that the GameStop pilot was complete and that GameStop intended to commence the rollout by February 28, 2015." *Id.* ¶ 33.

[15] *Id.* ¶ 31.

[16] *Id.* ¶ 32. Haney argues that this communication was false because Ulrich, along with other Blackhawk executives, knew of the Exclusivity Provision, which would prevent GameStop from consummating its transaction with CardLab until the provision expired in August 2015. *Id.* Blackhawk's knowledge of the Exclusivity Provision, Haney concludes, resulted in the GameStop portion of the Merger Agreement amounting to nothing more than a "sham transaction." *Id.* ¶ 33. Even with a three-month extension to the earnout period due to the GameStop-related revisions to the Merger Agreement, Blackhawk knew that the Exclusivity Provision would prevent CardLab from "reach[ing] the $50 million 2015 earnout payment." *Id.*

4

Blackhawk executed the Merger Agreement, including the revisions, on August 27, 2014.[17]

Had Sellers known of the Exclusivity Provision, Haney argues, they would have delayed execution of the Merger Agreement until the provision expired.[18] As a result of Blackhawk's alleged concealment and opportunistic revisions, it now stands to gain the benefits of the GameStop contract (negotiated prior to entering into the Merger Agreement) upon the expiration of the Exclusivity Provision.[19] Blackhawk's knowing misrepresentations and concealment of material information, Haney concludes, violated Section 3.3 of the Merger Agreement, which provides, in part, that "[n]either the execution and the delivery of this agreement or the Transaction Documents to which Parent or Merger Sub is a party, nor the consummation of the Contemplated Transactions, will . . . violate or conflict with any applicable Law."[20]

Haney further alleges that Blackhawk continues to violate two additional Merger Agreement provisions. First, he argues Blackhawk's failure to provide certain information to Sellers violates Section 5(j) of Exhibit A to the Merger

---

[17] *Id.* ¶ 33. Haney alleges, on information and belief, that GameStop's Director of Pre-Owned Merchandise acknowledged that GameStop did not encounter any issues with CardLab until the Blackhawk acquisition, and that it was the acquisition that halted progress. *Id.* ¶ 34.
[18] *Id.* ¶ 35.
[19] *Id.* ¶ 36.
[20] *Id.* Ex. A ("Merger Agmt.") § 3.3; *accord id.* ¶ 37.

Agreement ("Section 5(j)"). Specifically, Sellers are entitled to a "report specifying the status of each Identified Customer and Prospect" within thirty days of the end of each calendar month, and "the calculation of Net Revenues, Cost of Sales Expense and Gross Profit" within thirty days following the end of each Blackhawk fiscal quarter.[21] Blackhawk, Haney alleges, has failed to provide Sellers with the required monthly reports, which are necessary to calculate the earnout payments to which Sellers are entitled pursuant to Section 2.10(b) of the Merger Agreement (up to $50 million).[22]

Second, Haney argues that Blackhawk breached Section 5(i) of Exhibit A to the Merger Agreement ("Section 5(i)"), which requires that Blackhawk devote significant commercial resources to Sellers' "Identified Customers and Prospects."[23] Haney alleges, on information provided by "members of the Sellers'

---

[21] Merger Agmt. Ex. A § 5(j).

[22] Compl. ¶¶ 39-41. Haney acknowledges that Blackhawk sent a "one-page 'status report'" for each of April and May 2015, but argues that the reports are conclusory and "wholly insufficient to comply with its obligations under the Merger Agreement." *Id.* ¶ 41 n.16.

[23] Merger Agmt. Ex. A § 5(i); *accord* Compl. ¶ 42. Section 5(i) provides, in relevant part, that

> [Blackhawk] shall permit each of the Key Personnel . . . to dedicate a commercially reasonable amount of time as appropriate for their position to the generation of Net Revenues from the applicable Identified Customers and Prospects. It is understood and agreed that Glen Holbert, will devote substantially all of his time and efforts to the Identified Customers and Prospects, unless otherwise mutually agreed in writing by Parent and the Seller Representative. . . . During

6

group[,] that Blackhawk has not devoted, and has no intention of devoting, the required resources to Sellers' Accounts,"[24] and that he is unable to learn the details of such deficiencies because Blackhawk has instructed its employees not to communicate with him regarding this matter.[25]  Blackhawk's alleged breach of Sections 5(i) and 5(j) also prevent Haney from exercising his rights under Section 5(e) of Exhibit A to the Merger Agreement, which authorizes the Seller Representative "to replace the Identified Customers and Prospects that are lost or lack potential with Replacement Customers and Prospects listed in Schedule 2 of Exhibit A to the Merger Agreement."[26]

---

the 2015 Contingent Payment Period, Blackhawk shall, and shall cause the Surviving Corporation to, dedicate commercially reasonable resources (both personnel and services) to the Identified Customers and Prospects being serviced by Blackhawk and the Surviving Corporation. It is understood and agreed that providing resources for the Identified Customers and Prospects similar to what Blackhawk provides for its products and services shall constitute the provision of commercially reasonable resources.

Merger Agmt. Ex. A § 5(i).
[24] Compl. ¶ 43.  The Complaint defines "Sellers' Accounts" as Sellers' "Identified Customers and Prospects," which are listed in Schedule 1 of the Merger Agreement.  *Id.* ¶ 42.
[25] *Id.* ¶ 43.
[26] *Id.* ¶¶ 44-45.  Such rights allow Haney to maximize Sellers' payments under the Merger Agreement.  *Id.* ¶ 45.  Haney contends that disclosure of details regarding the resources Blackhawk has devoted to each account, which Blackhawk is improperly withholding, is necessary to benefit from such rights.  *Id.* ¶ 46.

Haney, in his capacity as Seller Representative, filed the initial complaint on March 30, 2015, which Blackhawk moved to dismiss on May 4, 2015. Haney then filed the Complaint on June 22, 2015, to which Blackhawk responded with the present Motion to Dismiss.

## II. CONTENTIONS

Blackhawk argues that the Merger Agreement subjects Haney's claims to a limited remedies provision that mandates alternative dispute resolution, that his claims are premature because the appropriate earnout payment is not yet known, and that each of the seven counts in the Complaint fails to plead a claim for relief.[27] Haney, in turn, disputes each of Blackhawk's contentions and argues that each count adequately states a claim for relief.[28]

## III. ANALYSIS

A. *Legal Standard on Blackhawk's Motion to Dismiss*

When considering a motion to dismiss, this Court accepts as true all well-pleaded facts in the Complaint, including vague allegations so long as they provide the defendant notice of the claim.[29] The Court will not, however, "accept every

---

[27] Def. Blackhawk Network Holdings, Inc.'s Opening Br. in Supp. of its Mot. to Dismiss Pl.'s Am. Compl. ("Def.'s Opening Br.") 9, 14, 16.

[28] Pl.'s Answering Br. in Opp'n to Blackhawk Network Holdings, Inc.'s Mot. to Dismiss Pl.'s Am. Compl. ("Pl.'s Answering Br.") 19, 24, 26, 36-37, 39, 46-48.

[29] *Cent. Mortg. Co. v. Morgan Stanley Mortg. Capital Hldgs. LLC*, 27 A.3d 531, 536 (Del. 2011).

strained interpretation proposed by the plaintiff."[30] "Dismissal of a claim based on contract interpretation is proper 'if the defendants' interpretation is the *only* reasonable construction as a matter of law.'"[31]

B. *Plaintiff Properly Alleged Fraudulent Inducement*

Section 9.8 of the Merger Agreement ("Section 9.8") provides, in part, that

> no claim, action, or remedy shall be brought or maintained subsequent to the Closing Date . . . based upon any alleged misstatement or omission respecting an inaccuracy in or breach of any of the representations, warranties, or covenants of the Company or Parent and Merger Sub, as applicable, set forth or contained in this Agreement; provided, however, that nothing in this Agreement shall be deemed to prevent or restrict the bringing or maintaining of any such claim or action, or the granting of any such remedy, to the extent that the same shall have been the result of fraud by any such Person or by the Company.

Blackhawk argues that, in light of Section 9.8, "the only suits that can be brought are ones based upon fraud arising from reps, warranties or covenants,"[32] and that because Haney has not done so, he "must pursue these claims pursuant to the mandatory and exclusive indemnification procedure and may not do so in this Court."[33] Haney responds that Section 9.8 does not preclude fraud claims based on

---

[30] *Caspian Alpha Long Credit Fund, L.P. v. GS Mezzanine P'rs 2006, L.P.*, 93 A.3d 1203, 1205 (Del. 2014).

[31] *Id.* (quoting *Vanderbilt Income & Growth Assocs., L.L.C. v. Arvida/JMB Managers, Inc.*, 691 A.2d 609, 613 (Del. 1996)).

[32] Tr. of Oral Arg. on Def.'s Mot. to Dismiss ("Oral Arg. Tr.") 10.

[33] Def.'s Opening Br. 14. Specifically, Section 9.5 of the Merger Agreement creates a dispute resolution process as an exclusive means for resolving certain enumerated disagreements, which requires providing the indemnifying party

9

statements made outside the scope of the Merger Agreement.[34] To support this position, he argues that the word "such" in the "provided, however" clause of Section 9.8 relates back only to the portion of the section that precludes claims "based upon any alleged misstatement or omission," not also to the qualifying phrase "respecting an inaccuracy in or breach of any of the representations, warranties, or covenants . . . set forth or contained in this Agreement."[35]

At the motion to dismiss stage, "a trial court cannot choose between two differing reasonable interpretations of ambiguous documents."[36] An ambiguity exists where a contractual provision is "reasonably or fairly susceptible of different interpretations."[37] Here, each party's interpretation is reasonable, that is, the "provided, however" clause may relate back to the entire preceding clause, or it may relate back solely to the portion precluding claims based upon an alleged misstatement or omission. Therefore, the Court accepts Plaintiff's interpretation of the Merger Agreement's limited remedies provision as reasonably conceivable. Accordingly, for purposes of this Motion to Dismiss, Section 9.8 does not preclude

---

"reasonably prompt" notice of the claim and allowing the indemnifying party thirty days after receipt of such notice to respond in writing to the claim, after which, assuming no such response, the indemnified party may "pursue such remedies as may be available to [it] on the terms and subject to the provisions of this Agreement." Merger Agmt. § 9.5.

[34] Pl.'s Answering Br. 21-22; Oral Arg. Tr. 53.

[35] Oral Arg. Tr. 53.

[36] *Vanderbilt Income & Growth Assocs., L.L.C. v. Arvida/JMB Managers, Inc.*, 691 A.2d 609, 613 (Del. 1996).

[37] *Id.*

fraud claims based on "alleged misstatement[s] or omission[s]" occurring outside the four corners of the Merger Agreement.[38]

Still impeding Plaintiff's fraud claim, however, is an integration clause located in Section 11.14 of the Merger Agreement ("Section 11.14"), which provides that no party or affiliate makes any representation with respect to CardLab, except those set forth in the Merger Agreement, and that the Merger Agreement constitutes the entire agreement and supersedes all prior understandings and communications.[39]  Blackhawk argues that this provision confines the parties' representations, warranties, and agreements to the Merger Agreement, and therefore "leaves no room for the parties to rely upon any extra-contractual representations or warranties."[40]  Blackhawk's interpretation of Section 11.14's

---

[38] Merger Agmt. § 9.8.

[39] *Id.* § 11.14.  Section 11.14 provides, in full, that

> [n]one of the Company, the Sellers, nor any of their respective Affiliates, officers, directors, employees, or agents makes any representation or warranty, express or implied, as to any financial or other matter with respect to the Company, or their respective businesses, operations or assets, except for the representations and warranties of the Company expressly set forth in this Agreement. This Agreement, the Transaction Documents and the Confidentiality Agreement constitute the sole and entire agreement among the Parties with respect to the subject matter of this Agreement and supersede all prior and contemporaneous understandings, agreements, or representations, whether written or oral, by or among the Parties with respect to such subject matter, including the Letter of Intent dated June 20, 2014.

*Id.*

[40] Def.'s Opening Br. 12-13.

scope is, however, contrary to established precedent. Delaware law does not preclude fraud claims based on extra-contractual statements merely because the contract contains an integration clause.[41] Instead, the "integration clause must contain 'language that . . . can be said to add up to a clear anti-reliance clause by which the plaintiff has contractually promised that it did not rely upon statements outside the contract's four corners in deciding to sign the contract.'"[42]

In *Kronenberg*, this Court concluded that "the defendants cannot escape responsibility for the material misstatements of fact made to the plaintiffs in connection with the plaintiffs' decision to invest in [a company]" because the integration clause, similar to the clause here, "is not an unambiguous acknowledgement by the plaintiffs that they were not relying on factual statements not contained within the [contract] itself."[43] Because Section 11.14 does not

---

[41] *Abry P'rs V, L.P. v. F & W Acquisition LLC*, 891 A.2d 1032, 1058-59 (Del. Ch. 2006).

[42] *Id.* at 1059 (alteration in original) (quoting *Kronenberg v. Katz*, 872 A.2d 568, 593 (Del. Ch. 2004)).

[43] *Kronenberg*, 872 A.2d at 594. This rule creates a "sensible balance between fairness and equity—parties can protect themselves against unfounded fraud claims through explicit anti-reliance language. If parties fail to include unambiguous anti-reliance language, they will not be able to escape responsibility for their own fraudulent representations made outside of the agreement's four corners." *Abry P'rs*, 891 A.2d at 1059; *see also Addy v. Piedmonte*, 2009 WL 707641, at *19 (Del. Ch. Mar. 18, 2009) ("A balance must be struck, however, between the competing interests of allowing sophisticated parties to fashion agreements among themselves without intervention by the courts and of protecting parties from counterparties attempting to wash clean their own outright lies and fraud.").

contain "express 'anti-reliance'" language, it does not preclude Plaintiffs' fraud claims based on alleged extra-contractual statements.[44]

Although Sections 9.8 and 11.14 do not, at this stage, preclude Plaintiff's fraud claims, to survive Blackhawk's Motion to Dismiss, Plaintiff still must adequately allege fraudulent conduct.  To do so, Haney must plead with specificity facts from which the Court may reasonably infer that: (1) Blackhawk falsely represented or omitted facts that it had a duty to disclose, (2) Blackhawk knew or believed that the representation was false or made the representation with a reckless indifference to the truth, (3) Blackhawk intended to induce Sellers to act or refrain from acting, (4) Sellers justifiably relied on the representation, and

---

[44] *Kronenberg*, 872 A.2d at 593.  Blackhawk also argues that Haney's claims are premature because (1) the appropriate earnout payment is not yet known and therefore plaintiff's claims are speculative and premature, and (2) the Merger Agreement allows CardLab, for purposes of calculating earnout revenue, to substitute any existing or potential customer to replace the loss of existing or prospective customers.  Def.'s Opening Br. 14-15.  Each of these arguments fails: (1) Plaintiff has suffered $2.5 million in calculable damages in the form of the withheld purchase price, and (2) Plaintiff has alleged facts from which the Court may infer that Blackhawk's actions have precluded Plaintiff from exercising his rights of substitution.  Pl.'s Answering Br. 24-25.  Further, Haney's claim relates to a specific potential customer, GameStop, without which, Haney alleges, Sellers cannot reach the maximum earnout.  Compl. ¶ 33.  The fact that a contract provision may allow Sellers to reduce the harm of Blackhawk's alleged fraud does not exculpate Blackhawk therefrom.  Finally, damages need not be proven with specificity at the motion to dismiss stage.  *See Anglo Am. Sec. Fund, L.P. v. S.R. Glob. Int'l Fund, L.P.*, 829 A.2d 143, 156 (Del. Ch. 2003) ("Proof of [alleged] damages and of their certainty need not be offered in the complaint in order to state a claim.").

(5) Sellers' reliance caused injury.[45]   Blackhawk's Opening and Reply briefs dispute only whether Haney adequately plead facts from which the Court may infer Blackhawk's knowledge of and Haney's reliance on the alleged misrepresentations or omissions.  Therefore, the Court assumes for purposes of this Motion to Dismiss that the Complaint satisfies the remaining elements.

Haney must present "specific facts that lead to a reasonable inference that" Blackhawk had actual knowledge of the alleged Exclusivity Provision.[46] Blackhawk argues that Plaintiff's allegations that Blackhawk's executives were familiar with the industry, that these executives were responsible for Blackhawk's SEC filings (which acknowledge exclusive relationships between potential partners and Blackhawk's competitors), and that Blackhawk and InComm have been "embroiled in patent litigation since 2009" are insufficient to support a reasonable inference that Blackhawk "knew or was in a position to know of GameStop's alleged contract with InComm."[47]

While such facts do not show with specificity that Blackhawk had the alleged knowledge, they are "specific facts," and they do, even if barely, support a reasonable inference that Blackhawk, through its executives, had actual knowledge

---

[45] *Eurofins Panlabs, Inc. v. Ricerca Biosciences, LLC*, 2014 WL 2457515, at *7 (Del. Ch. May 30, 2014) (quoting *Abry P'rs*, 891 A.2d at 1050).

[46] *Fortis Advisors LLC v. Dialog Semiconductor PLC*, 2015 WL 401371, at *6 (Del. Ch. Jan. 30, 2015).

[47] Def. Blackhawk Network Holdings, Inc.'s Reply Br. in Supp. of its Mot. to Dismiss Pl.'s Am. Compl. ("Def.'s Reply Br.") 11-12.

of the Exclusivity Provision. The facts (1) that Blackhawk's executives are familiar with the industry (and specifically the exclusive nature of Blackhawk's competitors' partner engagements); (2) that Blackhawk and InComm "often compete for the same customers within the same industry, providing similar, if not identical, types of products and services;"[48] (3) that Blackhawk sought and received CardLab's approval to revise the Merger Agreement's payment structure to authorize Blackhawk to withhold $2.5 million until GameStop signed the contract; and (4) that even with the three month extension to the earnout period, the Exclusivity Provision would prevent Sellers from reaching the $50 million earnout payment, support a reasonable inference that Blackhawk knew of the Exclusivity Provision and failed to disclose that information to Haney.[49]

Further, CardLab justifiably relied on Blackhawk's statements and omissions. Blackhawk argues that because CardLab negotiated with GameStop for over a year, and because the Merger Agreement barred Blackhawk from contacting GameStop until after the closing of the Merger Agreement, it was Blackhawk that relied on CardLab's representations regarding GameStop, not the other way

---

[48] Pl.'s Answering Br. 29; Compl. ¶ 27 n.12.

[49] This Court considers "the Complaint as a whole" to infer knowledge. *NACCO Indus., Inc. v. Applica Inc.*, 997 A.2d 1, 27 (Del. Ch. 2009). Further, the Court of Chancery Rule 9(b) heightened pleading requirement in fraud cases "takes into account whether 'the facts lie more in the knowledge of the opposing party than of the pleading party.'" *Id.* at 26 (quoting *H-M Wexford LLC v. Encorp, Inc.*, 832 A.2d 129, 146 (Del. Ch. 2003)).

around.[50]  This Court, however, recognizes that reliance is "a difficult line to draw" and, in certain cases, may not be appropriately addressed at the motion to dismiss stage.[51]  Here, Blackhawk's allegation that CardLab was in a better position than Blackhawk to learn of the Exclusivity Provision does not itself establish that Plaintiff did not rely, or should not have relied, on Blackhawk's misrepresentations.  Considering the facts that Blackhawk's executives, knowledgeable of the industry, stated that "[n]o one expects a delay in getting the GameStop deal signed,"[52] that Blackhawk allegedly actively concealed information regarding the Exclusivity Provision,[53] and that CardLab had no duty to engage in sufficient due diligence of GameStop to uncover a single provision in a particular contract between GameStop and a business partner, the Court is unwilling, at least at this stage in the proceeding, to grant Blackhawk's Motion to Dismiss on reliance grounds.

---

[50]  Def.'s Opening Br. 21.  The fact that the Merger Agreement prevented Blackhawk from communicating with GameStop until after the closing does not, however, preempt Haney's argument that Blackhawk knew of the agreement between InComm and GameStop prior to commencing Merger Agreement negotiations.

[51] *NACCO Indus.*, 997 A.2d at 31-32.

[52]  Compl. ¶ 32 (alteration in original) (quoting an August 8, 2014 email from Ulrich to David Jones (founder and former Chief Executive Officer of CardLab and currently serving as Vice President of Global eCommerce for Blackhawk)).

[53] *Id.* ¶ 2.

C. *Plaintiff Has Not Stated a Claim for Breach of Section 3.3 of the Merger Agreement*

Section 3.3 of the Merger Agreement ("Section 3.3") provides that neither the Merger Agreement nor any transaction contemplated therein violates any applicable law or results in a breach of any contract to which either Blackhawk or CardLab is a party "or by which it is bound."[54] Haney argues that Blackhawk breached Section 3.3 because any post-closing contract between GameStop and CardLab would force GameStop to violate the Exclusivity Provision.[55] Contrary to Haney's argument, however, Section 3.3 does not represent that the Merger Agreement will not interfere with prospective contracts between CardLab and

---

[54] Section 3.3 provides, in full, that

> [n]either the execution and the delivery of this Agreement or the Transaction Documents to which Parent or Merger Sub is a party, nor the consummation of the Contemplated Transactions, will (a) violate or conflict with any applicable Law or any provision of their respective Organizational Documents, or (b) conflict with, result in a breach of, constitute a default under, result in the acceleration of, create in any party the right to accelerate, terminate, modify, or cancel, or require any notice, consent, waiver, or approval under any material agreement, contract, lease, license, instrument, or other arrangement to which Parent or Merger Sub is a party or by which it is bound or to which any of its assets are subject, in which such default, acceleration, termination, modification, cancellation, or the failure to obtain such consent, waiver or approval would have a Merger Sub Material Adverse Effect. Neither Parent nor Merger Sub is required to give any notice to, make any filing with, or obtain any authorization, consent, or approval of any Governmental Entity in order to consummate the Contemplated Transactions, except the filing of the Certificate of Merger with the Secretary of State of Delaware in accordance with the DGCL.

[55] Pl.'s Answering Br. 37.

potential customers. As Blackhawk notes, "Section 3.3 only relates to the Contemplated Transactions that are a necessary part of Blackhawk's purchase of CardLab."[56] Further, because CardLab and GameStop had not executed their agreement prior to finalizing the Merger Agreement, Sellers cannot argue that the GameStop contract was one to which CardLab was "bound." Therefore, Blackhawk's motion to dismiss count two of the Complaint is granted.

D. *The Complaint States a Claim Entitling Plaintiff to Section 5(j) Reports*

Haney argues, and Blackhawk concedes, that Haney is entitled to monthly reports pursuant to Section 5(j) of the Merger Agreement ("Section 5(j)").[57] While Blackhawk acknowledges that the sufficiency of its productions "cannot be addressed at the motion to dismiss stage," it contends that the reports it has provided to Haney to date "contain more than the information required by the Merger Agreement," and that therefore this claim is moot.[58] As alleged in the

---

[56] Def.'s Reply Br. 18. The Merger Agreement defines Contemplated Transactions as "transactions contemplated by this Agreement and the other Transaction Documents," Merger Agmt. § 1, and Transaction Documents as "this Agreement and the other agreements, certificates and documents to be executed and delivered pursuant to this Agreement." *Id.* at Recital A.

[57] Def.'s Reply Br. 18.

[58] *Id.* at 19; Def.'s Opening Br. 23-24. Blackhawk also argues that while Haney may seek specific performance, any claim for monetary damages due to a failure to produce Section 5(j) reports is speculative and violates the Merger Agreement's exclusive remedy provision. Def.'s Reply Br. 19. Blackhawk, however, raised this argument for the first time in its Reply Brief, and the Court therefore treats it as waived at this time. *Thor Merritt Square, LLC v. Bayview Malls LLC*, 2010 WL 972776, at *5 (Del. Ch. Mar. 5, 2010) ("The failure to raise a legal issue in an

Complaint, however, Blackhawk has not produced any monthly reports for January through March of 2015, and the April and May reports are conclusory and contain insufficient information.[59] Blackhawk's Motion to Dismiss is therefore denied with respect to count three of the Complaint.

E. *Plaintiff Has Not Stated a Claim for Breach of the Implied Covenant of Good Faith and Fair Dealing*

Haney argues that the Complaint properly pleads two implied covenant claims: "(1) Blackhawk breached the implied covenant by deliberately acting to keep Sellers from earning the 2015 Contingency Payment; and (2) Blackhawk breached the implied covenant by failing to disclose the existence of the exclusivity agreement."[60] As explained below, however, neither of Haney's claims invokes the implied covenant of good faith and fair dealing.

---

opening brief generally constitutes a waiver of the ability to raise that issue in connection with a matter under submission to the court."); *Franklin Balance Sheet Inv. Fund v. Crowley*, 2006 WL 3095952, at *4 (Del. Ch. Oct. 19, 2006) ("[A] party is obliged in its motion and opening brief to set forth all of the grounds, authorities and arguments supporting its motion. A movant should not hold matters in reserve for reply briefs. Instead, reply briefs should consist of material necessary to respond to the answering brief." (footnote omitted)); *Emerald P'rs v. Berlin*, 2003 WL 21003437, at *43 (Del. Ch. Apr. 28, 2003) ("It is settled Delaware law that a party waives an argument by not including it in its brief."), *aff'd*, 840 A.2d 641 (Del. 2003). Blackhawk further argues in its Reply Brief that Plaintiff is not entitled to monetary damages for its count four claim for breach of Section 5(i). Def.'s Reply Br. 19-20. This argument, too, is absent from Blackhawk's Opening Brief and is therefore waived.

[59] Compl. ¶¶ 41-42, n.16.

[60] Pl.'s Answering Br. 39.

To state a claim for breach of the implied covenant, a plaintiff "must allege [1] a specific implied contractual obligation, [2] a breach of that obligation by the defendant, and [3] resulting damage to the plaintiff."[61]  The implied covenant, however, "only applies where a contract lacks specific language governing an issue and the obligation the court is asked to imply advances, and does not contradict, the purposes reflected in the express language of the contract."[62]  Where the contract specifically addresses the issue complained of, "[e]xisting contract terms control, [and] implied good faith cannot be used to circumvent the parties' bargain, or to create a 'free-floating duty . . . unattached to the underlying legal document.'"[63]

---

[61] *Kelly v. Blum*, 2010 WL 629850, at *13 (Del. Ch. Feb. 24, 2010) (alterations in original) (quoting *Fitzgerald v. Cantor*, 1998 WL 842316, at *1 (Del. Ch. Nov. 10, 1998)).

[62] *All. Data Sys. Corp. v. Blackstone Capital P'rs V L.P.*, 963 A.2d 746, 770 (Del. Ch.), *aff'd*, 976 A.2d 170 (Del. 2009).  While the Supreme Court has maintained that a contractual gap is not necessary to state a claim for breach of the implied warranty where one party "acted arbitrarily or unreasonably, thereby frustrating the fruits of the bargain," *Gerber v. Enter. Prods. Hldgs., LLC*, 67 A.3d 400, 421 (Del. 2013), *overruled on other grounds by Winshall v. Viacom Int'l, Inc.*, 76 A.3d 808 (Del. 2013), the Merger Agreement explicitly governs the allegedly wrongful behavior and Haney has not stated facts from which the Court may infer the operation of an implied covenant.

[63] *Dunlap v. State Farm Fire & Cas. Co.*, 878 A.2d 434, 441 (Del. 2005) (third alteration in original) (footnote omitted) (quoting *Glenfed Fin. Corp., Commercial Fin. Div. v. Penick Corp.*, 647 A.2d 852, 858 (N.J. Super. Ct. App. Div. 1994)).

First, the Merger Agreement specifically addresses Haney's claim that Blackhawk deliberately prevented Sellers from achieving earnout thresholds. As quoted more fully above, Section 5(i) requires that Blackhawk permit "Key Personnel . . . to dedicate a commercially reasonable amount of time as appropriate for their position to the generation of Net Revenues," contemplates that Glen Holbert will "devote substantially all of his time and efforts to the Identified Customers and Prospects," and requires that Blackhawk dedicate commercially reasonable resources (both personnel and services) to the Identified Customers and Prospects."[64] The Merger Agreement defines "commercially reasonable resources" as "similar to what Blackhawk provides for its products and services."[65]

Haney argues that, while Section 5(i) requires that Blackhawk dedicate personnel time and resources, it "does not impose a standard for evaluating the conduct of Blackhawk personnel in attempting to generate revenues from the Identified Customers and Prospects."[66] Haney supports this argument by attempting to distinguish the provision at issue here from that in *Fortis Advisors*, which provided that "***Parent shall, and shall cause its Affiliates . . . to, use commercially reasonable best efforts,*** in the context of successfully managing the business of the Surviving Corporation, ***to achieve and pay the Earn–Out***

---

[64] Merger Agmt. Ex. A § 5(i).
[65] *Id.*
[66] Pl.'s Answering Br. 42.

21

***Payments in full***."[67]   The agreement also contained "a number of specific obligations and prohibitions concerning [the purchaser's] operation of the business."[68]   The *Fortis Advisors* Court held that the plaintiff had not "identified, as it must, a gap in the Merger Agreement to be filled by implying terms through the implied covenant."[69]

Haney argues that the "best efforts" standard and specific obligations present in the *Fortis Advisors* agreement distinguish it from the Merger Agreement.  To the contrary, however, Section 5(i) provides specific requirements by which Blackhawk must abide to avoid breaching the contract.[70]   Further, not only has Haney failed to identify a gap in the Merger Agreement, his allegation in the Complaint that Blackhawk "intended to deprive Sellers from achieving their 2015 contingent payment" relies solely on his claim that Blackhawk violated Sections 5(i) and 5(j).[71]   Where a plaintiff has failed to identify a gap in the contract, merely repeating the defendant's allegedly improper acts or omissions already the subject of a separate breach of contract claim is insufficient to support a claim for breach of the implied covenant of good faith and fair dealing.[72]

---

[67] *Fortis Advisors*, 2015 WL 401371, at *2 (alteration in original).
[68] *Id.*
[69] *Id.* at *4 (footnote omitted).
[70] *See supra* text accompanying notes 64-65.
[71] Compl. ¶¶ 38-43.
[72] *Fortis Advisors*, 2015 WL 401371, at *4-5 (dismissing an implied covenant claim because the plaintiff "failed to identify any 'interstitial space in which the

22

Second, Haney argues that Blackhawk's failure to disclose the existence of the Exclusivity Provision after the Merger Agreement closed constitutes a breach of the implied covenant of good faith and fair dealing.[73] This alleged "continuing obligation," Haney contends, would prevent CardLab from achieving certain earnout payments.[74] Here too, however, Haney fails to identify a gap in the Merger Agreement that would allow operation of the implied covenant. As Blackhawk notes, the Merger Agreement provides for continuing updates regarding actual and prospective customers. Specifically, Section 5(j) requires Blackhawk to deliver to Haney, within thirty days of the end of each month, "a written report specifying the status of each Identified Customer and Prospect." Notably, count three of the Complaint alleges breach of Section 5(j) due to Blackhawk's "failure to provide Plaintiff with the [required] information."[75] Therefore, to the extent Blackhawk had a continuing obligation to inform Sellers of the Exclusivity Provision, the obligation is subsumed within the express provisions of the Merger Agreement, and Haney's implied covenant claim must fail.

---

doctrine of the implied covenant might operate' regarding any of the six actions or failures of [the defendant]," which were already subject to a separate breach of contract claim).

[73] Pl.'s Answering Br. 44-45.

[74] *Id.* at 45.

[75] Compl. ¶ 65. Whether any Section 5(j) report must include the information allegedly withheld is a question of fact not ripe for determination at this stage in the proceeding.

## F. *Plaintiff Has Stated a Claim for Unjust Enrichment*

The Complaint alleges that Blackhawk has been unjustly enriched by the $2.5 million in merger payments that Blackhawk conditioned on timely execution of the GameStop contract and the revenue that will accrue to Blackhawk (with no earnout consequence) if it executes the GameStop contract upon expiration of the Exclusivity Provision.[76] Blackhawk argues that this unjust enrichment claim fails because "there is no dispute that the parties' relationship is governed by the Merger Agreement."[77] To the contrary, however, count one of the Complaint seeks reformation of the Merger Agreement alleging that Blackhawk fraudulently induced Haney's assent.[78] Although merely suggesting that the validity of a contract may be in doubt is insufficient to support a claim for unjust enrichment, a claim that the underlying agreement is subject to rescission due to fraudulent conduct or omissions is sufficient to do so.[79] Because Haney's fraud allegation is sufficient to withstand Blackhawk's motion to dismiss, and because Haney seeks equitable remedies, including reformation of the Merger Agreement and imposition of a constructive trust to prevent Blackhawk from improperly benefitting from its allegedly wrongful conduct,[80] Haney has adequately plead a

---

[76] *Id.* ¶¶ 86-87.
[77] Def.'s Opening Br. 28.
[78] Compl. ¶¶ 47-53.
[79] *In re Student Fin. Corp.*, 2004 WL 609329, at *7 (D. Del. Mar. 23, 2004).
[80] Compl. ¶¶ 88-89.

24

claim for unjust enrichment. Accordingly, Blackhawk's Motion to Dismiss count six for unjust enrichment is denied.

## G. *Plaintiff Has Stated a Claim for Negligent Misrepresentation*

A claim for negligent misrepresentation, otherwise known as equitable fraud, "requires proof of all of the elements of common law fraud except 'that plaintiff need not demonstrate that the misstatement or omission was made knowingly or recklessly.'"[81] However, this doctrine may only be applied where

> one of the two fundamental sources of equity jurisdiction exist: (1) an equitable right founded upon a special relationship over which equity takes jurisdiction, or (2) where equity affords its special remedies, *e.g.,* "rescission, or cancellation; where it is sought to reform a contract . . . or to have a constructive trust decreed."[82]

Blackhawk argues that, because it and CardLab were sophisticated parties and engaged in an arm's length transaction, Haney's claim for negligent misrepresentation "did not provide a sufficiently 'firm[] basis in equity jurisdiction' to justify an equitable fraud claim."[83] In *U.S. West*, however, the plaintiff merely offered "facts that fail[ed] to establish common law fraud coupled with [a] request for an injunction."[84] Here, Plaintiff (1) has pleaded facts from

---

[81] *Williams v. White Oak Builders, Inc.*, 2006 WL 1668348, at *7 (Del. Ch. June 6, 2006) (quoting *H-M Wexford*, 832 A.2d at 144), *aff'd*, 913 A.2d 571 (Del. 2006).

[82] *U.S. W., Inc. v. Time Warner Inc.*, 1996 WL 307445, at *26 (Del. Ch. June 6, 1996) (alteration in original).

[83] Def.'s Opening Br. 32 (alteration in original) (quoting *U.S. W., Inc.*, 1996 WL 307445, at *26).

[84] *U.S. W., Inc.*, 1996 WL 307445, at *26.

which the Court may reasonably infer that Blackhawk engaged in fraudulent conduct, and (2) seeks multiple equitable remedies, including reformation and imposition of a constructive trust.[85] Blackhawk's Motion to Dismiss Plaintiff's claim for negligent misrepresentation is therefore denied.

## H. *Plaintiff Has Stated a Claim for Reformation*

To support a claim for reformation, "the party seeking such form of relief must plead with particularity the ingredients on which it is based, namely mutual mistake or fraud, Rule 9(b)."[86] Blackhawk argues that Haney is not entitled to reformation because, under Delaware law, "courts require a heightened showing of a party's true intentions before considering reformation."[87] Here, however, Haney has alleged facts from which the Court may reasonably infer that Blackhawk fraudulently induced CardLab to enter into the Merger Agreement,[88] and that a "specific prior understanding" existed with respect to the GameStop contract, that is, that the Merger Agreement would not preclude its execution. Because it is

---

[85] Pl.'s Answering Br. 47-48. Haney does not, however, allege that any special relationship exists between the parties. *Krahmer v. Christi's Inc.*, 903 A.2d 773, 785 (Del. Ch. 2006) (dismissing a negligent misrepresentation claim for failure to adequately allege the existence of a special relationship).

[86] *Gracelawn Mem'l Park, Inc. v. E. Mem'l Consultants, Inc.*, 280 A.2d 745, 748 (Del. Ch. 1971), *aff'd*, 291 A.2d 276 (Del. 1972).

[87] Def.'s Opening Br. 34.

[88] Blackhawk further argues that to justify reformation, Plaintiff must plead fraud in the execution, as opposed to fraud in the inducement as Haney does here. *Id.* at 35. Blackhawk does not cite any Delaware precedent, however, and wholly abandons this argument in its Reply Brief.

reasonably conceivable that Blackhawk fraudulently induced CardLab to enter into the Merger Agreement, Haney has stated a claim for reformation.[89]

## IV. CONCLUSION

For the reasons stated, Blackhawk's Motion to Dismiss is granted with respect to counts two (breach of Section 3.3) and five (breach of the implied covenant of good faith and fair dealing) of the Complaint. With respect to Haney's remaining claims, Blackhawk's Motion to Dismiss is denied.

An implementing order will be entered.

---

[89] Blackhawk's argument that reformation is not warranted because the Merger Agreement allows Plaintiff to replace customers on Schedule 1 and therefore compensate for underperformance is inapposite. That the Merger Agreement provides a mechanism by which Plaintiff may mitigate a business risk does not preclude an otherwise available remedy.

27