# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| WNYH, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 2017-0610-SG |
| | ) | |
| ACCUMED CORP. and ACCUMED | ) | |
| HOLDINGS CORP., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

Date Submitted: February 27, 2018
Date Decided: May 31, 2018

Kevin G. Abrams and Matthew L. Miller, of ABRAMS & BAYLISS LLP, Wilmington, Delaware; OF COUNSEL: Christopher R. Rodi and Brian J. Capitummino, of WOODS OVIATT GILMAN LLP, Rochester, New York, *Attorneys for Plaintiff*.

Gregory V. Varallo and Susan M. Hannigan, of RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware, *Attorneys for Defendants*.

GLASSCOCK, Vice Chancellor

This matter involves a sale of substantially all the assets of a Delaware LLC for approximately $35 million. A substantial part of those assets was located in the Dominican Republic. Both the seller and the buyer anticipated that, because the assets were located in a tax-free zone of that country, the sale would be free of capital gains tax. However, the sales contract (the "APA") was not made contingent on the receipt of any particular tax treatment from the Dominican Republic tax authority. Contractually, the liability for these taxes was placed on the seller.[1]

The APA provided the buyer with indemnification rights for certain liabilities. $2 million was placed in an escrow account to facilitate indemnification, and, absent claims, was payable to the seller at the end of the escrow term. Near the end of the term, the buyer apparently learned that the Dominican Republic tax authority would assess "anticipated" tax liability against the seller, for which the buyer feared it might also be jointly liable. As a consequence, it filed a claim against the escrow fund. Subsequently, the seller paid the anticipated tax of $100,000, and has been assessed (and disputes) tax liability to the Dominican Republic of $15 million.

---

[1] The seller asserted in the Complaint that the buyer is responsible for fifty percent of Dominican Republic taxes. Verified Complaint (the "Complaint" or "Compl.") ¶ 65. Neither party addressed the issue in briefing. At oral argument, the buyer contended that "foreign"—that is, Dominican Republic—taxes fall exclusively on the seller, per the APA. Feb. 27, 2018 Oral Arg. Tr. ("Tr.") 23:19–25:14. The seller did not rebut the buyer's argument and appeared to agree that it was solely responsible for these taxes. Tr. 75:1–16. I assume, for purposes of this Memorandum Opinion only, that Dominican Republic tax liability is allocated by the APA to the seller. Nothing in my decision here turns on that assumption.

The seller brought this action. It seeks a declaration that the buyer's claim against the escrow fund is a nullity, because claims must be based on liabilities incurred, not anticipated and contingent. It seeks tort and contract damages allegedly relying on the buyer's use of a subsidiary in the transfer of the assets, as well as the buyer's post-transaction actions. The seller also accuses the buyer of fraud. The buyer has moved to dismiss; this Memorandum Opinion addresses that motion, which is granted in part and denied in part.

## I. BACKGROUND[2]

### A. *The Parties*

Plaintiff WNYH, LLC is a Delaware limited liability company with a principal place of business in New York.[3] WNYH is the successor-in-interest or successor-in-name to another entity, AccuMED Innovation Technologies, LLC ("AIT LLC," or collectively, the "Seller").[4] The Seller sold substantially all of its assets (the "AIT Assets") to the Defendants.[5]

Defendant AccuMED Corporation ("AccuMED") is a Delaware corporation with a principal place of business in New York.[6] Defendant AccuMED Holdings

---

[2] The facts, drawn from the Complaint and from documents incorporated by reference therein, are presumed true for purposes of evaluating the Defendants' Motion to Dismiss. *See, e.g.*, *In re Gen. Motors (Hughes) S'holder Litig.*, 897 A.2d 162, 169 (Del. 2006).

[3] Compl. ¶ 7.

[4] *Id.* ¶¶ 1, 7.

[5] *Id.* ¶ 13.

[6] *Id.* ¶ 8.

Corporation ("Holdings") is also a Delaware corporation with a principal place of business in New York.[7] Holdings participated with AccuMED and others[8] (collectively, the "Buyer") in purchasing substantially all of the AIT Assets.[9] The AIT Assets were located in New York and in the Dominican Republic.[10] The Buyer and the Seller are parties to an APA defining rights and responsibilities with respect to the sale of the AIT Assets.[11]

*B. Significant Non-Parties*

According to the Buyer, Mezed Inversiones S.R.L. ("Mezed") is a wholly owned subsidiary of AccuMED.[12] The Buyer structured the transaction so that Mezed was the initial acquirer of the AIT Assets in the Dominican Republic.[13] Mezed then transferred those Assets to AccuMED, which in turn transferred the Assets to Holdings.[14] In 2016, Lear Corporation acquired all outstanding and issued stock of Holdings.[15]

The *Direccion General de Impuestos Internos* (the "Tax Authority") is a tax authority for the Dominican Republic.[16] The Tax Authority assessed taxes against

---

[7] *Id.* ¶ 9.
[8] Certain equity owners of AIT LLC were also parties to the APA. *Id.* ¶ 2.
[9] *Id.* ¶ 13.
[10] *Id.* ¶¶ 13–14; Tr. 13:20–14:4.
[11] Compl. ¶¶ 2, 13.
[12] Tr. 39:8–9.
[13] Compl. ¶¶ 13–14, 23.
[14] *Id.* ¶¶ 23–24.
[15] *Id.* ¶ 24.
[16] *Id.* ¶ 34.

the Seller, arising from the transaction and, perhaps, the Buyer's conduct of business in the Dominican Republic.[17]

### C. Facts Leading to This Litigation

#### 1. The Buyer Acquires the AIT Assets

AIT LLC owned manufacturing facilities that produced fabrics for the medical industry.[18] Some of the facilities were located in a "free trade zone" in the Dominican Republic.[19] The Buyer agreed in the APA to purchase substantially all of the AIT Assets for approximately $35 million, subject to certain adjustments.[20] The transaction closed on October 9, 2014.[21] AIT LLC transferred the AIT Assets to Mezed, which then transferred the Assets to AccuMED.[22] AccuMED completed the transaction by transferring the Assets to Holdings.[23]

The parties set aside $2 million (together with all interest and other income earned thereon, the "Fund") of the approximately $35 million purchase price under an escrow agreement (the "Escrow Agreement") to cover indemnification rights in favor of the Buyer in the APA.[24] By the terms of the Escrow Agreement, the Fund was to be paid to the Seller on April 6, 2016, absent a timely claim against the Fund

---

[17] *Id.* ¶ 42.
[18] Tr. 14:1–4.
[19] Compl. ¶ 14.
[20] *Id.* ¶¶ 2, 13.
[21] *Id.* ¶ 22.
[22] *Id.* ¶¶ 23–24.
[23] *Id.* ¶ 24.
[24] *Id.* ¶¶ 2, 13.

4

by the Buyer.[25]  According to the Seller, the term within which claims were to be made was extended to May 6, 2016, at the Buyer's request.[26]  On May 5, 2016, the Buyer sent a claim certificate to the escrow agent[27] and a notice to AIT LLC for a "potential claim that the [Buyer] may sustain in relation to tax assessments, interest and penalties."[28]  The claim certificate sought the full $2 million.[29]  The indemnification term expired on May 6, 2016.[30]  The Seller provided a timely objection to the escrow agent and the Seller on May 13, 2016.[31]

### 2. The Tax Authority Assesses Taxes Against AIT LLC

Sometime after that objection, the Tax Authority assessed *anticipos* (estimated) taxes against the Seller because of its "failure to make certain tax filings in the Dominican Republic following the closing of the APA."[32]  The *anticipos* tax was assessed at $100,000.[33]

On October 5, 2016, the Buyer and Seller entered into a letter agreement concerning the Buyer's claim against the Fund (the "Escrow Letter" or the "Escrow Letter Agreement").[34]  The Escrow Letter states that the parties entered into the

---

[25] *Id.* at Ex. C (Amendment to Escrow Agreement), § 1.3(E).
[26] Tr. 63:17–64:3.
[27] Compl. ¶¶ 32–35, Ex. D (AccuMED notice to escrow agent).
[28] *Id.* at Ex. E (AccuMED notice to WNYH).
[29] *Id.*
[30] *Id.* ¶ 39.
[31] *Id.* ¶¶ 37–38, Exs. F–G.
[32] *Id.* ¶ 42.
[33] Tr. 73:23–74:2.
[34] Compl. Ex. H (Escrow Letter).

Escrow Letter "in resolution of the escrow release issue."[35] The Escrow Letter provides for the delivery of Joint Payment Instructions to the escrow agent to release two payments of $1 million each from the Fund.[36] The first payment is conditioned on, in part, a meeting between the parties and the Tax Authority and resolution of the *anticipos* taxes.[37] The second payment is conditioned, in part, on the elapse of six months after the Seller files its tax return in the Dominican Republic, provided that any issues raised by the Tax Authority are resolved.[38] The parties now debate the purpose and scope of the Escrow Letter. Sometime after the issuance of the Escrow Letter, the Seller avers that it paid the Dominican Republic government $100,000 for the *anticipos* tax.[39]

Subsequent to that payment, the Tax Authority informed the Seller that the Buyer "failed to properly declare the assets purchased from [the Seller] on certain of [the Buyer's] tax returns following the closing of the sale."[40] On July 26, 2017, the Tax Authority assessed a tax against the Seller of $15,613,498, including $4,061,785 in VAT taxes and $10,561,950 in capital gains taxes.[41] The VAT taxes purportedly arose from the Defendants' alleged use of the Seller's tax identification information

---

[35] *Id.*
[36] *Id.*
[37] *Id.*
[38] *Id.*
[39] Tr. 73:23–74:2.
[40] Compl. ¶ 46.
[41] *Id.* ¶¶ 53–54.

and a bank account in the Seller's name for purchases in the Dominican Republic after the transaction closed.[42] The Tax Authority did not then assess, and has not assessed, any taxes against the Buyer.[43]

### D. Procedural History

The Seller filed the Complaint on August 23, 2017, alleging six named causes of action. The first two are essentially the same. In its First Cause of Action, the Seller seeks a declaratory judgment that "no valid Claim has been made to the Escrow Agent and, consequently, Plaintiff is entitled to an immediate disbursement of the full amount of the Fund held in escrow."[44] In its Second Cause of Action, the Seller alleges that the Buyer breached the Escrow Agreement by submitting a claim certificate without underlying damages under the indemnification provision in APA Section 6.1.[45]

In its Fourth Cause of Action, the Plaintiff alleges that the Defendants breached Sections 5.2 and 5.3 of the APA by using Mezed as an intermediary in the transaction, in contravention of the Defendants' purported representation that AccuMED was the purchaser of the AIT Assets.[46] Alternatively, the Plaintiff argues that the same conduct—submitting an escrow claim certificate and using Mezed as

---

[42] *Id.* ¶¶ 55–58.
[43] Tr. 69:5–12, 73:2–5.
[44] Compl. ¶ 82.
[45] *Id.* ¶¶ 83–91.
[46] *Id.* ¶¶ 101–110.

an intermediary—breached the implied covenant of good faith and fair dealing (Causes of Action Three and Five).[47] Lastly, the Seller alleges that the Buyer committed fraud by (1) failing to properly declare the AIT Assets on its Dominican Republic tax returns; (2) representing that AccuMED was the entity that would purchase the AIT Assets, when in fact the Assets were transferred to Mezed; and (3) representing that the Buyer was in compliance with all applicable laws and regulations.[48] In reliance on these fraudulent representations, the Seller entered the Escrow Letter Agreement, which should thus be found void (Sixth Cause of Action).[49] Finally, the Seller alleges the Buyer wrongfully used the Seller's Dominican Republic taxpayer identification information in making post-transaction purchases, leading to the Seller incurring tax liability properly owed by the Buyer (also in the Sixth Cause of Action).[50]

The Buyer filed a Motion to Dismiss these claims on September 19, 2017. I heard argument on February 27, 2018. The Motion is granted in part and denied in part. My analysis follows.

---

[47] *Id.* ¶¶ 92–100, 111–16.
[48] *Id.* ¶¶ 117–29.
[49] *Id.* ¶¶ 122–23.
[50] *Id.* ¶¶ 125–26.

## II. ANALYSIS

The Defendants have moved to dismiss the Complaint under Court of Chancery Rule 12(b)(6). When reviewing such a motion,

> (i) all well-pleaded factual allegations are accepted as true; (ii) even vague allegations are well-pleaded if they give the opposing party notice of the claim; (iii) the Court must draw all reasonable inferences in favor of the non-moving party; and (iv) dismissal is inappropriate unless the plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances susceptible of proof.[51]

I need not, however, "accept conclusory allegations unsupported by specific facts or . . . draw unreasonable inferences in favor of the non-moving party."[52]

### A. The Escrow Dispute: Causes of Action First, Second, and Third

The Seller seeks a declaration that under the contractual language of the APA and Escrow Agreement, either as written or as supplemented by the implied covenant of good faith and fair dealing, the Buyer's claim against the Fund was invalid and in breach of the APA, and is a nullity; it also seeks an order releasing the Fund to the Seller. For the reasons below, I deny the Buyer's Motion to Dismiss these Causes of Action.

#### 1. Indemnification and Declaratory Judgment

Section 6.1 of the APA requires the Seller to indemnify the Buyer for "any claim, Liability, obligation, loss, damage, assessment, judgment, cost, and expense

---

[51] *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del. 2002) (citations and internal quotation marks omitted).

[52] *Price v. E.I. DuPont de Nemours & Co.*, 26 A.3d 162, 166 (Del. 2011).

. . . (collectively, 'Damages').")[53] "Liability" is defined in the APA thus: "any liability or obligation of whatever kind or nature (whether known or *unknown*, whether asserted or *unasserted*, whether absolute or *contingent*, whether accrued or *unaccrued*, whether liquidated or unliquidated, and whether due or *to become due*)."[54] Therefore, if the Buyer is ultimately liable for Dominican Republic taxes resulting from the sale of the AIT Assets, as it allegedly fears, it will be entitled to indemnification by the Seller (absent contractual defenses).

The parties set aside the $2 million Fund in escrow to facilitate certain indemnification payments. The parties executed a separate Escrow Agreement to govern treatment of claims against the Fund for indemnification under Section 6.1. The Buyer submitted a timely claim against the Fund for potential tax liability, which it avers it determined in good faith may exceed $2 million.[55]

The Escrow Agreement was executed simultaneously with the APA, with one Amendment on April 6, 2016.[56] By default, the Escrow Agreement required that the Fund be distributed to the Seller at the end of the indemnification term, less any disputed or payable claims.[57] The April 6, 2016 Amendment directs the escrow agent to "automatically distribute to Seller 100% of the then-remaining Fund less

---

[53] Compl. Ex. A (APA), § 6.1.
[54] *Id.* at Art. VIII (emphases added).
[55] Tr. 43:12–13.
[56] Compl. Exs. A–C.
[57] *Id.* at Ex. B (Escrow Agreement), § 1.3(E).

10

the Outstanding Claims Amount" on "the later of May 6, 2016" or the "Business Day after" the escrow indemnification term ends.[58]  Disputed amounts would be distributed through instructions from a "(i) joint written instrument" or "(ii) a final non-appealable order of a court of competent jurisdiction."[59]  However, if the Buyer "delivers a written certification to [the] Escrow Agent" of a claim to the Fund, and the Seller does not "within 30 calendar days . . . dispute all or any of the amounts set forth therein," then the escrow agent will transfer the portion of the Fund claimed in the claim certificate to the Buyer.[60]  If the Seller objects to the claim certificate, the escrow agent must "continue to hold . . . that portion of the Funds requested in the Claim Certificate, or the disputed portion thereof . . . pending receipt of either (i) Joint Payment Instructions, or (ii) a Court Order."[61]  The Buyer submitted its claim certificate to the escrow agent for the full amount of the Fund on May 5, 2016.[62]  The Seller filed an objection.[63]  Thus, the escrow agent has not released the Fund to either party.

---

[58] *Id.* at Ex. C (Amendment to Escrow Agreement), 1.
[59] *Id.* ¶ 27, Ex. B (Escrow Agreement), § 1.3(B)(i).
[60] *Id.* at Ex. B (Escrow Agreement), § 1.3(C).
[61] *Id.* § 1.3(D).
[62] *Id.* ¶¶ 32–35, Exs. D–E.
[63] *Id.* ¶ 37.

The parties attempted to address their dispute by agreement. On October 5, 2016, the parties executed the Escrow Letter Agreement.[64] The Escrow Letter provides the following context:

> Purchaser previously submitted a Claim Certificate to the Escrow Agent with respect to the Fund, alleging a potential claim of $2,000,000 against the Funds. The Company [WNYH] subsequently submitted an Objection to the Escrow Agent with respect to the full amount alleged under the Claim Certificate. In resolution of *the escrow release issue*, the parties are entering into this letter agreement.[65]

The Escrow Letter allows for an initial release of $1 million,

> "immediately following the: (a) completion of a *meeting* between representatives of [the Tax Authority, Seller, and Buyer] to discuss the anticipos (or estimated taxes) asserted by [the Tax Authority] and the reasons why the anticipos should not have been assessed; and (b) *resolution* of the *anticipos* (or estimated taxes) asserted by [the Tax Authority], either by a determination that no taxes or penalties are owed or any taxes and penalties determined being paid."[66]

The first condition has not been met. The *anticipos* taxes were paid by the Seller, in the amount of $100,000, but the Seller is disputing the final tax assessment of almost $15 million. The Escrow Letter also provides for release of the remaining balance of the Fund six months after the Seller files its final tax return in the Dominican Republic pertaining to the asset sale, unless the Tax Authority raises any "additional material issues."[67] This second condition is inchoate, for the same

---

[64] *Id.* at Ex. H (Escrow Letter).
[65] *Id.* (emphasis added).
[66] *Id.* (emphases added).
[67] *Id.*

reason. Finally, the Escrow Letter states that "[the Buyer] and the [Seller] agree to deliver Joint Payment Instructions to the Escrow Agent to release" the first and second releases of the Fund, based on the stated conditions.[68]

Here, the Seller asks for a declaration that the Buyer's claim against the Fund was improper, and void, and asks that I direct the agent to release the Fund to the Seller. In opposition to these requests, the Buyer interposes the Escrow Letter as a binding agreement of the parties. It views the Escrow Letter as a final settlement of the rights of the Seller to receive the Fund, and seeks specific enforcement of that settlement. While the Buyer also argues that its claim against the Fund was proper, and thus that the Seller's claims for release of the Fund must be denied in any event, I must first address whether the matter was settled by the Escrow Letter.

The parties described the purpose of the Escrow Letter succinctly in that document: "In resolution of the escrow release issue, the parties are entering into this letter agreement."[69] Nonetheless, the Seller argues that the Escrow Letter does not prevent it from seeking release of the Fund. It relies on two arguments, one strong, the other not.

The latter argument is that the Escrow Letter bound the Buyer to give a written release to the escrow agent upon certain conditions, but it did *not* bind the Seller

---

[68] *Id.*
[69] *Id.*

13

from pursuing legal relief. That facile position is incompatible with the agreed-to "*resolution* of the escrow release issue" explicitly provided in the Escrow Letter, however.

The Seller's better argument is that the parties did not mean the Escrow Letter Agreement to indefinitely estop the Seller from seeking release of the Fund in the face of changed circumstances. In this reading, the "escrow release issue" is the Buyer's assertion that it may be liable, secondarily, after the assertion of *anticipos* taxes against the Seller. The Agreement contemplated, for instance, a meeting with the Tax Authority to resolve the *anticipos* assessment; and then a payment by the Seller of any such assessment, resulting in the first ($1 million) disbursement from the Fund. That *anticipos* tax assessment *has been made*. The Seller, however, has been assessed a $15 million final tax, which was not anticipated by the parties, who expected the transaction to be tax free. As a result, according to the Seller, the Escrow Letter terms are not enforceable in these circumstances, and the parties never meant that a years-long dispute over an eight figure tax assessment must be resolved before the Fund is disbursed.

The Escrow Letter is ambiguous as to the parties' intent in the current situation. I cannot, at the pleading stage, enforce it specifically. Entitlement to specific performance requires, *inter alia*, that the movant show, by clear and convincing evidence, that a valid and enforceable contract exists and that the movant

14

is currently entitled to performance.[70]  Because of this decision, I need not address the Seller's rather half-hearted argument in the Sixth Cause of Action that the Escrow Letter was procured by the Buyer's fraud; that may await a developed record as well.

## 2. Indemnification and the Escrow Claim

I next turn to the Buyer's argument that its claim against the Fund was valid under the Escrow Agreement.  To grant the Buyer's Motion to Dismiss, I must find that its claim was sufficient to toll the distribution of the Fund at the end of the term, as a matter of law.

The nature of the parties' dispute here is simple; does the Escrow Agreement allow the Buyer to cause the agent to maintain the Fund beyond the term by making a claim for indemnification for liabilities that are inchoate or contingent?  Both parties agree that the Escrow Agreement and the Indemnification Provisions of the APA are clear and unambiguous; they read them differently, however.  I examine the parties' views, below.

The Escrow Agreement provides that the Fund is to be disbursed to the Seller at the end of the term, absent a claim by the Buyer that "it is *entitled* to receive all or any portion of the Fund pursuant to the [APA] and such certification includes a

---

[70] *E.g., Osborn v. Kemp,* 991 A2d 1153, 1158 (Del. 2010).

15

description (in reasonable detail) of the amount and nature of such amounts *owed*."[71] As the Seller points out, this is written to provide for a presently-payable amount—then owed—to the Buyer, as indemnification under the APA. The result of such a claim, absent a dispute by the Seller, is that the escrow agent would then pay the claim from the Fund to the Buyer. Here, the claim actually submitted by the Buyer was not for an amount "owed." Instead, the Buyer's claim against the Fund was for an unknown amount that may become owed if (1) the Seller were to be assessed taxes, (2) the Seller did not pay the assessment, and (3) the Tax Authority then assessed those taxes against the Buyer. Noting that this claim was not only not currently owed when made, but was entirely contingent, the Seller argues that the claim was not valid.

The Buyer, for its part, notes that I must read the contracts in harmony and as a whole.[72] It points out that these contracts indemnify it against damages including "Liabilities," a term defined in the APA to include liabilities present and future, known and unknown. Since the Escrow Agreement was meant to facilitate the indemnification provisions of the APA, argues the Buyer, it must provide for anticipated claims against the Fund, if not for current release, then to maintain the

---

[71] Compl. Ex. B (Escrow Agreement), § 1.3(C) (emphasis added).
[72] *GMG Capital Investments, LLC v. Athenian Venture P'rs I, L.P.*, 36 A.3d 776, 779 (Del. 2012) ("In upholding the intentions of the parties, a court must construe the agreement as a whole, giving effect to all provisions therein.").

Fund as an indemnification-facilitation vehicle. The Seller, for its part, argues that while the Buyer may be owed indemnification for future liabilities, the plain language of the Escrow Agreement limits claims and payments from the Fund for liabilities incurred during the term. The Buyer points out that it is entirely common for escrow agreements in connection with asset purchase agreements to be structured so that they survive until resolution of potential indemnification rights.[73] I am not dealing with common escrow agreements, however, but the specific Escrow Agreement negotiated between the parties here. The Escrow Agreement read in light of the entire agreement of the parties is, I find, ambiguous. Because I cannot find that the Buyer's construction is correct as a matter of law, the Motion to Dismiss based on the validity of the Buyer's claim against the Fund must be denied.

For the foregoing reasons, the Buyer's Motion to Dismiss the Seller's First and Second Causes of Action is denied. The Motion to Dismiss the portion of the Sixth Cause of Action pertaining to fraud in the inducement of the Escrow Letter is also denied.

---

[73] So strong is this understanding of escrow in this context, according to the Buyer, that a contrary construction here would effectively incur the end of the world of escrow, as we know it. I am sanguine, however. Good draftsmen have been effective at drafting around obtuse judges since there have been draftsmen and judges.

### 3. The Implied Covenant

In the Seller's Third Cause of Action, it seeks to employ the implied covenant of good faith and fair dealing in support of the relief sought in its First and Second Causes of Action. The implied covenant involves a "cautious enterprise"[74] and is "rarely invoked successfully."[75] "The implied covenant is inherent in all contracts and is used to infer contract terms to handle developments or contractual gaps that the asserting party pleads neither party anticipated."[76] The party raising the claim must "prove[] that the other party has acted arbitrarily or unreasonably, thereby frustrating the fruits of the bargain that the asserting party reasonably expected."[77] A court "must assess the parties' reasonable expectations at the time of contracting."[78] The implied covenant "does not establish a free-floating requirement that a party act in some morally commendable sense."[79] Rather, "good faith" here involves "faithfulness to the scope, purpose, and terms of the parties' contract" while "fair dealing" means acting "consistently with the terms of the parties' agreement and its purpose."[80]

---

[74] *Nemec v. Shrader*, 991 A.2d 1120, 1125 (Del. 2010) (quoting *Dunlap v. State Farm Fire & Cas. Co.*, 878 A.2d 434, 445 (Del. 2005)).

[75] *Kuroda v. SPJS Holdings, L.L.C.*, 971 A.2d 872, 888 (Del. Ch. 2009).

[76] *Dieckman v. Regency GP LP*, 155 A.3d 358, 367 (Del. 2017) (internal citations omitted).

[77] *Nemec*, 991 A.2d at 1126.

[78] *Id.*

[79] *Allen v. El Paso Pipeline GP Co., L.L.C.*, 2014 WL 2819005, at *10 (Del. Ch. June 20, 2014).

[80] *Gerber v. Enter. Prods. Holdings, LLC*, 67 A.3d 400, 419 (Del. 2013) (emphasis omitted), *overruled on other grounds by Winshall v. Viacom Int'l, Inc.*, 76 A.3d 808 (Del. 2013).

18

I find the application of the implied covenant here doubtful. I have found, however, that ambiguities lurk in the intentions of the parties as expressed in the Escrow Agreement and the APA. Given that fact, and in the specific scenario before me, where ambiguities reside in the contractual provisions said to contain the gap subject to the covenant, it is premature to address the possible relevance of the implied covenant with respect to the Seller's claim to the Fund. Accordingly, I deny the Buyer's Motion to Dismiss the Third Cause of Action.

*B. The Breach of Contract Claims*

The principles of contract interpretation are well known:

> [w]hen interpreting a contract, the Court will give priority to the parties' intentions as reflected in the four corners of the agreement. In upholding the intentions of the parties, a court must construe the agreement as a whole, giving effect to all provisions therein. The meaning inferred from a particular provision cannot control the meaning of the entire agreement if such an inference conflicts with the agreement's overall scheme or plan . . . . A contract is not rendered ambiguous simply because the parties do not agree upon its proper construction. Rather, an ambiguity exists [w]hen the provisions in controversy are fairly susceptible of different interpretations or may have two or more different meanings.[81]

It is well established that "[d]ismissal of a claim based on contract interpretation is proper if the defendants' interpretation is the *only* reasonable construction as a

---

[81] *GMG Capital Investments, LLC*, 36 A.3d at 779–80 (second alteration in original) (citations and internal quotation marks omitted).

matter of law."[82]  The Seller alleges breach of contract claims under the APA and Escrow Agreement.  My analysis follows.

### 1. Fourth Cause of Action: Breach of Contract

The Seller points out that the Buyer caused the AIT Assets to be transferred, in the first instance, to Mezed; it then caused Mezed to transfer the Assets to AccuMED. The Seller argues that using Mezed in that manner was a breach of contract.  The APA contains numerous references to the term "Purchaser."  The Purchaser is defined as "AccuMED Corp." in the APA preamble.[83]  Section 1.1 states that the Purchaser "will purchase and acquire" the AIT Assets from the Seller.[84]  Section 1.3 states that "[a]t the Closing, [the Seller] will assign and delegate to Purchaser, and Purchaser will assume," a particular list of liabilities.[85]  Section 2.2 requires delivery of certain documents such as "certified copies of the resolutions duly adopted by Purchaser's board of directors authorizing the execution, delivery and performance of this Agreement."[86]  In other words, the Seller asserts that the APA makes it clear that the AIT Assets were to be transferred to AccuMED as the

---

[82] *Caspian Alpha Long Credit Fund, L.P. v. GS Mezzanine P'rs 2006, L.P.*, 93 A.3d 1203, 1205 (Del. 2014) (citations and internal quotation marks omitted).
[83] Compl. Ex. A (APA).
[84] *Id.* § 1.1.
[85] *Id.* § 1.3.
[86] *Id.* § 2.2(b)(ii).

"Purchaser." This diagram illustrates the difference between that understanding and the actual transaction:



According to the Seller, the use of Mezed as an intermediary purchaser violated at least two provisions of the APA. APA Section 5.2 requires, in part, that "[e]ach of [Holdings] and Purchaser has all requisite company power and authority to enter into and consummate the transactions contemplated by this Agreement."[87] APA Section 5.3 states, in part, that

> the execution and delivery of this Agreement . . . will [not] (a) conflict with or violate any provision of the Organizational Documents of [Holdings] or Purchaser, (b) violate or conflict with any Law, rule, regulation, writ, judgment, injunction, decree, determination, award or other order of any Government Entity that is applicable to [Holdings] or Purchaser.[88]

---

[87] Id. § 5.2.
[88] Id. § 5.3.

21

Neither of these alleged breaches is actionable. Section 5.2 is a power and authority clause; the Seller does not contend that the Buyer lacked the corporate power to purchase the AIT Assets. At oral argument, the Seller pressed Section 5.3 as more pertinent. The Seller's argument is as follows. The parties expected this transaction to be tax free, although they failed to make the APA contingent on tax treatment. The Seller, however, has been assessed capital gains taxes in the Dominican Republic of over $10 million. The Seller is disputing this assessment by the Tax Authority, and professes to not know why it has been so assessed.[89] It suspects, however, that it may have been the use of Mezed, rather that AccuMED, as the taker of title to the Assets that caused the Tax Authority to asses this tax.[90] Therefore, the Seller argues, the Buyer caused the "execution and delivery" of the APA to "violate or conflict with" law, in violation of Section 5.3. But, even assuming the use of Mezed caused the transaction to incur tax, that is not unlawful. Nothing about the transaction is alleged to have violated a "[l]aw, rule, regulation, writ, judgment, injunction, decree, determination, award or other order of any Governmental Agency," and the Complaint does not allege otherwise: an *application* of tax law is not a *violation* of tax law. The parties could have, but did

---

[89] Tr. 74:14–20.

[90] The Seller suspects that the Buyer assigned a tax exemption certificate to Mezed, and the fact that the certificate was not held by AccuMED, the named purchaser, aroused the Tax Authority's interest and suspicion. Pl.'s Ans. Br. in Opp'n to Defs.' Mot. to Dismiss ("Ans. Br.") 45–46.

22

not, condition the transaction on tax-free status, and they could have assigned the responsibility for taxes differently. But given the contract as written, the Seller has failed to state a claim for breach of Sections 5.2 or 5.3.[91]

In fact, the use by the Buyer of an affiliate in the transaction is contemplated in the APA. Section 9.4 states that the "Purchaser may assign in whole or in part its rights and obligations pursuant to this Agreement to one or more of its Affiliates."[92] This includes, logically, the right to receive the Assets. The Buyer asserts that Mezed is a wholly owned subsidiary of AccuMED, and thus an affiliate under the APA; therefore, argues the Buyer, it had the contractual right to substitute Mezed as the purchaser.[93] The Seller, by contrast, argues that Mezed's status as an

---

[91] It is unclear whether the Seller attempts to plead a fraud claim for damages resulting from the use of Mezed, rather than AccuMED, to receive the AIT Assets. To the extent I can tease such a claim from the Complaint supplemented by the briefing, it can be stated thus: (1) AccuMED was the purchaser, per the APA; (2) the Buyer had no right to substitute Mezed as the purchaser in place of AccuMED; (3) notwithstanding its promise in the APA, the Buyer knew, but did not disclose, that it meant to substitute Mezed as the purchaser; (4) the Seller was unaware of the Buyer's impending breach of the APA, and relied on the Buyer's contractual promise that AccuMED would be the purchaser of the AIT Assets; (5) the Seller was damaged as a consequence, in that it was assessed taxes it did not contemplate would result from the AIT Asset sale.

If the Seller did intend to plead such a cause of action in fraud, it must be dismissed. The syllogism above is a classic attempt to bootstrap a breach of contract action into a claim for fraud, an attempt that our courts have consistently rejected. *See, e.g.*, *Cornell Glasgow, LLC v. La Grange Props., LLC*, 2012 WL 2106945, at *8 (Del. Super. June 6, 2012) (Slights, J.) (holding that a plaintiff cannot state a fraud claim "merely by intoning the *prima facie* elements of [fraud] while telling the story of the defendant's failure to perform under the contract").

[92] Compl. Ex. A (APA), § 9.4.

[93] In its Opening Brief on this Motion, the Buyer asserted that Mezed is an affiliate of AccuMED as defined in the APA, as an entity "controlled" by AccuMED. Defs. AccuMED & Holdings' Opening Br. in Supp. of Their Mot. to Dismiss Pl.'s Verified Compl. Opening Br. (the "Opening Br.") 10. The APA defines an "Affiliate of any particular Person" as "any other Person controlling, controlled by or under common control with such particular Person, where 'control' means the

affiliate of the Buyer is an unresolved issue of fact, and that the Buyer's use of Mezed was unanticipated by the parties to the APA. It states in the Complaint, unequivocally, that "Mezed . . . had no right under [the APA] to acquire the [AIT Assets] directly from" the Seller, and that the Buyer's use of Mezed was "unilateral," "undisclosed," and "unauthorized."[94] The Seller's Answering Brief repeats these allegations.[95]

The Seller's allegations are troublesome, in light of a resolution of the Seller's board of directors (the "Resolution") submitted at oral argument by the Buyer.[96] I note that the Resolution is not attached to the Complaint and is extraneous to the record for purposes of this Motion to Dismiss. When presented with the Resolution, however, the Seller's counsel stated that the Seller was not "disputing that there was a resolution that was entered into that indicated that the buyer could transfer its assets to Mezed."[97] In fact, the Resolution was entered a week before the transaction closed, and acknowledged Mezed's right to take the AIT Assets *from the Seller*: "RESOLVED: This Board authorizes the transfer of all the rights and benefits of [AIT LLC], in the Dominican Republic, on behalf of [Mezed]."[98] Because I have

---

possession, directly or indirectly, of the power to direct the management and policies of a Person whether through the ownership of voting securities, Contract or otherwise." Compl. Ex. A (APA), Art. VIII.

[94] Compl. ¶¶ 47, 49, 51.

[95] Ans. Br. 11, 32–33.

[96] Court Ex. 1 (Dkt. No. 17).

[97] Tr. 83:8–12.

[98] Court Ex. 1 (Dkt. No. 17).

found that the Seller has failed to state a claim for breach of contract, I need not consider the Resolution further, or whether the Seller has adopted it for purposes of this Motion. However, the Verified Complaint, in light of the Resolution, appears to state facts that the Plaintiff should have known at the time of filing were untrue.

### 2. Fifth Cause of Action: The Implied Covenant

In the alternative, in its Fifth Cause of Action, the Seller argues that the Buyer breached the implied covenant of good faith and faith dealing, relying on the same facts involving Mezed that allegedly amount to a breach of the APA: "[t]o the extent [the Buyer's] conduct is not an express breach of APA Sections 5.2 and 5.3 . . . [its] conduct is a breach of the implied covenant of good faith and fair dealing."[99]

Again, the Seller is liable under the APA for taxes resulting from the sale,[100] and it alleges that the parties intended the transaction to be free of capital gains tax. Instead, it has been assessed some $10 million by the Tax Authority. The Seller speculates that this assessment resulted from the use of Mezed by the Buyer, although it does not allege that such is the case. Assuming that it did so result, and assuming that the parties knew that assignment of the AIT Assets to Mezed would have resulted in tax liability, argues the Seller, they surely would have agreed to exclude Mezed from the transaction. If so, however, that does not authorize me to

---

[99] Compl. ¶ 115.
[100] *See supra*, note 1.

25

change the contract by application of the implied covenant, to impose that term. The result would be to find the Buyer in breach, retroactively, of an implied term it could not have anticipated, with the effect of shifting liability for taxes arising from the transaction from the Seller to the Buyer. The Complaint does not allege that the parties knew use of Mezed would cause tax liability. Importantly, the Seller does not allege in the Complaint that the Buyer acted "arbitrarily or unreasonably,"[101] based on Buyer's knowledge at the time of the transaction, to frustrate Seller's purpose in contracting. There is no allegation in the Complaint that the Buyer used Mezed to strip the Seller of the benefit of its bargain, or that it acted to exploit a lacuna in the APA. The implied covenant is inapplicable. This is simply a situation where unforeseen consequences have made the contract less valuable to the Seller than it anticipated; accordingly, it wishes to rewrite the contract. I am sympathetic. But parties are bound to their agreements, good and bad. The implied covenant is not a license to rebalance benefits and burdens that a party now regrets.[102]

### C. Sixth Cause of Action: Fraud

I have addressed above the Seller's claim in its Sixth Cause of Action that the Escrow Letter Agreement is void as the product of fraud. That Cause of Action

---

[101] *Nemec*, 991 A.2d at 1126 ("We will only imply contract terms when the party asserting the implied covenant proves that the other party has acted arbitrarily or unreasonably, thereby frustrating the fruits of the bargain that the asserting party reasonably expected.").

[102] *See, e.g., id.* ("[W]e must assess the parties' reasonable expectations at the time of contracting and not rewrite the contract to appease a party who later wishes to rewrite a contract he now believes to have been a bad deal.").

contains an unrelated allegation as well, that the Buyer "defrauded" the Seller by "using [the Seller's Dominican Republic] taxpayer identification information in connection with purchases they made," post transaction.[103] This use was without "right or authorization."[104] The Seller, at the time of the sale of the AIT Assets to the Buyer, had stopped doing business in the Dominican Republic. Nonetheless, due to the Buyer's "wrongful use" of the Seller's tax identification, the Seller was assessed VAT taxes by the Tax Authority. The Seller alleges that it has been wrongly assessed more than $4 million in taxes due to the wrongful use of its tax identification information by the Buyer.[105]

The Buyer seizes on the heading of the Sixth Cause of Action—"fraud"—and the word "defrauded" used in these allegations. It points out, correctly, that the allegations do not state a cause of action for fraud,[106] and asks me to dismiss the claim. Delaware long ago dropped formalism in favor of notice pleading, however.[107] Here, the Plaintiff alleges that the Defendants seized control of and

---

[103] Compl. ¶ 125.

[104] *Id.* ¶ 126.

[105] *Id.* ¶¶ 53–57; Tr. 79:14–24.

[106] A claim for fraud requires a plaintiff to "plead facts supporting an inference that: (1) the defendant falsely represented or omitted facts that the defendant had a duty to disclose; (2) the defendant knew or believed that the representation was false or made the representation with a reckless indifference to the truth; (3) the defendant intended to induce the plaintiff to act or refrain from acting; (4) the plaintiff acted in justifiable reliance on the representation; and (5) the plaintiff was injured by its reliance." *Abry P'rs V, L.P. v. F & W Acq. LLC*, 891 A.2d 1032, 1050 (Del. Ch. 2006).

[107] *See, e.g.*, Ct. Ch. R. 8(a)(1) (requiring only "a short and plain statement of the claim showing that the pleader is entitled to relief"); *Cent. Mortg. Co. v. Morgan Stanley Mortg. Capital Holdings LLC*, 27 A.3d 531, 535 (Del. 2011) (stating that a claim should not be dismissed "unless the

wrongfully used its asset—the tax identification information—resulting in tax liability falling on the Plaintiff, rather than on the Defendants, the entity that actually took the actions incurring the tax. This states a tort claim, conversion, resulting in damages.[108] The pleading, while inartful, is sufficiently pellucid for the Buyer to defend. Therefore, the Motion to Dismiss the Seller's cause of action relying on the wrongful use of its tax identification information is denied.

### III. CONCLUSION

The Motion to Dismiss is granted in part and denied in part. The parties should submit a form of order consistent with this Memorandum Opinion.

---

plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances"); *Doe v. Cahill*, 884 A.2d 451, 458 (Del. 2005) ("Thus, for a complaint to survive a motion to dismiss, it need only give 'general notice of the claim asserted.'") (quoting *Ramunno v. Cawley*, 705 A.2d 1029, 1034 (Del. 1998)); *Klein v. Sunbeam Corp.*, 94 A.2d 385, 391 (Del. 1952) ("[A] plaintiff must put a defendant on fair notice in a general way of the cause of action asserted, which shifts to the defendant the burden to determine the details of the cause of action by way of discovery for the purpose of raising legal defenses.").

[108] Conversion has several elements. "Conversion is an act of dominion wrongfully exerted over the property of another, in denial of h[er] right, or inconsistent with it." *Arnold v. Soc'y for Sav. Bancorp, Inc.*, 678 A.2d 533, 536 (Del. 1996) (internal quotation marks omitted) (citing *Drug, Inc. v. Hunt*, 168 A. 87, 93 (Del. 1933)). "In order to prove conversion, a plaintiff must show that: (1) it had a property interest in equipment or other property; (2) it had a right to possession of the property; and (3) the property was converted." *Gould v. Gould*, 2012 WL 3291850, at *7 (Del. Ch. Aug. 14, 2012) (internal quotation marks omitted). Conversion may be remedied through applying "the conversion formula of damages." *Am. Gen. Corp. v. Cont'l Airlines Corp.*, 622 A.2d 1, 13 (Del. Ch.), *aff'd*, 620 A.2d 856 (Del. 1992) (awarding damages based on conversion of stock); *see also Robinson v. Oakwood Vill., LLC*, 2017 WL 1548549, at *17 (Del. Ch. Apr. 28, 2017) ("At common law, damage was compensable for torts, including conversion or trespass, in the amount of the actual damages; that is, the tortfeasor's victim could be made whole for his loss.").

28