CASPIAN ALPHA LONG CREDIT FUND, L.P., Caspian Select Credit Master Fund, Ltd., Caspian Capital Partners, L.P., and Mariner LDC, Plaintiffs–Below, Appellants,

v.

GS MEZZANINE PARTNERS 2006, L.P., and GS Mezzanine Partners V, L.P., Defendants–Below, Appellees.

No. 472, 2013.

Supreme Court of Delaware.

Submitted: April 30, 2014.
Decided: May 22, 2014.

**1204**

Neal J. Levitsky, Esquire, Seth A. Niederman, Esquire, Carl D. Neff, Esquire, Fox Rothschild LLP, Wilmington, DE; of Counsel: Daniel P. Goldberg, Esquire, Holwell Shuster & Goldberg, LLP, New York, NY, for Appellants, Caspian Alpha Long Credit Fund, L.P., Caspian Select Credit Master Fund, Ltd., Caspian Capital Partners, L.P., and Mariner LDC.

Kevin G. Abrams, Esquire, Derrick Farrell, Esquire, Abrams & Bayliss LLP, Wilmington, DE; of Counsel: Irwin H. Warren, Esquire, Lauren B. Hoelzer, Esquire, Weil, Gotshal & Manges LLP, New York, NY; and Christine T. DiGuglielmo, Esquire, Weil, Gotshal & Manges LLP, Wilmington, DE, for Appellees, GS Mezzanine Partners 2006, L.P., and GS Mezzanine Partners V, L.P.

Before STRINE, Chief Justice, BERGER, and RIDGELY, Justices.

STRINE, Chief Justice:

In 2007, Marisco Superholdco, LLC and Marisco Superholdco Notes Corp. (collectively, the "Issuer") issued notes (the "Superholdco Notes") through a private placement under an indenture dated December 14, 2007 (the "Indenture") between the Issuer and Wells Fargo Bank, N.A., as Trustee. In 2010, as part of a financial restructuring, the Issuer proposed amendments to the Indenture that were approved by a majority of the Superholdco noteholders. The appellees, GS Mezzanine Partners 2009, L.P. and GS Mezzanine Partners V, L.P. (collectively, "GS Mezzanine"), who owned a majority of the Superholdco Notes, voted in favor of the amendments.

The appellants, Caspian Alpha Long Credit Fund L.P., Caspian Select Master Fund, LTD., Caspian Capital Partners, L.P., and Mariner LDC (collectively "Caspian"), are Superholdco noteholders who brought suit in the Court of Chancery contending that they were injured by the amendments to the Indenture. Caspian's complaint included claims against GS Mezzanine, which were premised on the theory that Section 6.06 of the Indenture gave Caspian a basis to sue its fellow noteholder for voting to approve the amendments to the Indenture that Caspian believed were unfavorable to it. GS Mezzanine moved to dismiss the claims against it under Court of Chancery Rule 12(b)(6), and the Court of Chancery granted that motion, finding that Section 6.06 could not reasonably be read to provide Caspian with a basis to sue GS Mezzanine for voting to approve amendments to the Indenture. On appeal, Caspian argues that the Court of Chancery erred and that Section 6.06 can be reasonably read to provide it with a basis to sue GS Mezzanine for breach of contract. For the following reasons, we affirm the Court of Chancery's dismissal of the claims Caspian brought against GS Mezzanine.

 We review the Court of Chancery's dismissal of a claim under Rule 12(b)(6) *de novo*.[1] In deciding a motion to dismiss under Rule 12(b)(6), a trial court must accept as true all well-pled allegations of fact and draw reasonable inferences in the plaintiff's favor, but a court is not required to accept every strained interpretation proposed by the plaintiff.[2] Dismissal of a claim based on contract interpretation is proper "if the defendants' interpretation is the *only* reasonable construction as a matter of law."[3]

Section 6.06 of the Indenture reads in its entirety as follows:

Section 6.06 *Limitation on Suits.*

A Holder may pursue a remedy with respect to this Indenture or the Notes only if:

(1) Such Holder has previously given the Trustee notice that an event of Default is continuing;

(2) Holders of at least 25% in aggregate principal amount of the then outstanding Notes have requested the Trustee to pursue the remedy;

(3) Such Holders have offered the Trustee reasonable security or indemnity against any loss, liability, or expense;

(4) The Trustee has not complied with such request within 60 days after the receipt of the request and the offer of security or indemnity; and

(5) Holders of a majority in aggregate principal amount of the then outstanding Notes have not given the Trustee a direction inconsistent with such request within such 60–day period.

A holder of a Note may not use this Indenture to prejudice the rights of another Holder of a Note or to obtain a preference or priority over another Holder of a Note.[4]

Caspian's argument on appeal is based on the notion that the last sentence of Section 6.06 stands for the proposition that if a noteholder votes to approve amendments to the Indenture that are injurious to a dissenting noteholder, then it has breached contractual duties it owes under the Indenture and must pay damages to the dissenting noteholder.

 But, as the Court of Chancery held, Caspian's reading of the Indenture is not a reasonable one.[5] The Indenture is governed by New York law.[6] Under New York law, when interpreting a contract the task of a court is to read the contract as a whole and "give to each clause its intended purpose in the promotion of the primary

**1.** *In re General Motors S'holder Litig.*, 897 A.2d 162, 167–68 (Del.2006).

**2.** *Id.* at 168.

**3.** *Vanderbilt Income & Growth Assocs., LLC v. Arvida/JMB Managers, Inc.*, 691 A.2d 609, 613 (Del.1996) (internal citations omitted) (emphasis in original); *VLIW Tech., LLC v. Hewlett–Packard Co.*, 840 A.2d 606, 615 (Del. 2003).

**4.** Appendix to Opening Br. at A443–44 (Indenture).

**5.** Although the Court of Chancery's discussion of Section 6.06 during its bench ruling was terse, the extensive colloquy between the Court of Chancery, Caspian, and GS Mezzanine throughout the hearing on the motion to dismiss reveals the Court of Chancery's reasoning, and the brief ruling is understandable in view of that lengthy discussion. *See, e.g.,* Appendix to Opening Br. at 1342–43, Tr. at 18–19; Appendix to Opening Br. at 1345, Tr. at 21; Appendix to Opening Br. at 1354, Tr. at 30; Appendix to Opening Br. at 1378, Tr. at 54.

**6.** Appendix to Opening Br. at 458 (Indenture, Section 11.06).

and dominant purpose of the contract." [7] A court will only find a contract to be ambiguous when "the terms of the contract could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." [8] As a matter of public policy, New York courts endeavor to give commercial contracts that use standard language a consistent meaning. [9] To that end, in considering whether a contract, such as an indenture, is ambiguous, courts may consider commercial usage and sources such as model contracts, like the Model Debenture Indenture Provisions adopted by the Corporate Debt Financing Project of the American Bar Association (the "Model Indenture"). [10]

In this case, the Court of Chancery properly applied New York law principles and determined that Section 6.06 did not give Caspian a basis to sue GS Mezzanine for voting to approve amendments to the Indenture that Caspian disagreed with. The Court of Chancery properly read the last sentence of Section 6.06 in the context of the rest of the language used in that section, which deals with a situation in which a noteholder, rather than the Trustee, is permitted to take on the special role of enforcing the Indenture. The language, when read in full context rather than in isolation, makes it clear that the last sentence of Section 6.06 provides that when a noteholder is acting in a representative capacity as a fiduciary for all noteholders, the noteholder may not use that position to advantage itself to the detriment of the other noteholders it is representing.

The Court of Chancery's conclusion that Caspian's contrary interpretation of Section 6.06 was not a reasonable reading of the Indenture's language was further supported by the Model Indenture and its various iterations, which the Court of Chancery properly examined and relied on. The Court of Chancery correctly determined that the commentary to the Model Indenture contradicted Caspian's reading and supported the conclusion that the last sentence of Section 6.06 focused on the specific situation addressed by that section—when a noteholder, rather than the Trustee, was permitted to sue—and was not a broad provision subjecting notehold-

---

7. *Empire Properties Corp. v. Mfrs. Trust Co.,* 288 N.Y. 242, 43 N.E.2d 25, 28 (1942).

8. *Law Debenture Trust Co. of N.Y. v. Maverick Tube Corp.,* 595 F.3d 458, 466 (2d Cir.2010) (internal citations omitted).

9. *Sharon Steel Corp. v. Chase Manhattan Bank, N.A.,* 691 F.2d 1039, 1048 (2d Cir.1982) ("[U]niformity in interpretation is important to the efficiency of the capital markets.... Whereas participants in the capital market can adjust their affairs according to a uniform interpretation, whether it be correct or not as an initial proposition, the creation of enduring uncertainties as to the meaning of boilerplate provisions would decrease the value of all debenture issues and greatly impair the efficient working of capital markets. Such uncertainties would vastly increase the risks and, therefore, the costs of borrowing with no

offsetting benefits either in the capital market or in the administration of justice.").

10. *Bank of New York v. First Millennium, Inc.,* 598 F.Supp.2d 550, 564–54 (S.D.N.Y.2009) (rejecting an argument that the Commentaries to the Model Indentures were parol evidence and holding that reliance on the Commentaries to interpret contracts is consistent with New York law); *see also Sharon Steel Corp. v. Chase Manhattan Bank, N.A.,* 691 F.2d 1039, 1048 (2d Cir.1982) (relying on commentaries to the Model Indenture to interpret an indenture); *Feder v. Union Carbide Corp.,* 141 A.D.2d 799, 800, 530 N.Y.S.2d 165 (2d Dept.1988) (relying on commentaries to the Model Indenture to interpret an indenture).

ers to potential liability when they voted to approve an Indenture amendment that did not have unanimous support. The Court of Chancery's conclusion that the commentary to the original Model Indenture remained relevant to interpreting the language of the Indenture, which closely tracks the language of the Model Indenture now in effect, was also correct. The commentaries to the three iterations of the Model Indenture are consistent and explain that the last sentence of Section 6.06 is related to that section's status as a no-action clause and does not create a wide-ranging contractual basis for suit against noteholders who support Indenture amendments that other noteholders do not favor.[11] Indeed, to read Section 6.06 in the novel way that Caspian now advances would unsettle the marketplace by reading into the standard no-action clause a powerful cudgel for dissenting noteholders that has never been previously recognized in generations of prior cases involving those clauses. The Delaware courts are not the proper forum for this sort of judicial innovation in New York law, which seems contrary to New York's public policy of giving commercial instruments a consistent and predictable meaning.

Moreover, the Court of Chancery's conclusion is supported by the effect that Caspian's reading of Section 6.06 would have on other provisions of the Indenture. Section 9.02 specifically permitted the amendments at issue in this case to be approved by a majority of the noteholders and did not require unanimous consent, as the Indenture requires for certain other amendments. To read Section 6.06 as subjecting noteholders who exercised their voting rights by voting in favor of an amendment to liability when that vote is not unanimous would place noteholders at risk simply for voting in their self-interest. This toll on voting rights would be odd, not only because the Indenture writers knew how to require unanimous approval, but because the Indenture writers also expressly subjected the amendment power to certain limitations contained in other sections of the Indenture, but did *not* subject the ability to adopt amendments to Section 6.06.[12] Additionally, as GS Mezzanine points out, the Indenture is not reasonably

11. The Commentaries to the 1965 Model Indenture state that the limitations contained in what is now Section 6.06 apply "only on suits under the Indenture." AMERICAN BAR FOUNDATION, COMMENTARIES ON MODEL DEBENTURE INDENTURE PROVISIONS 1965, § 5.7, at 232–33 (1971). The Commentaries explain that the last sentence of Section 6.06 prohibits a noteholder who has otherwise fulfilled the requirements of Section 6.06—which allows a noteholder to stand in the shoes of the indenture trustee and bring a suit under the indenture—from, for example, bringing a suit for reformation of an indenture if it would disturb or prejudice the rights of other noteholders under the indenture. *Id.* at 234. Although the language of Section 6.06 was revised in the subsequent Model Indentures, the Commentaries continued to describe Section 6.06 only as a "no action" clause and have never indicated that the last sentence of Section 6.06 applies to anything other than the situation where a noteholder has been permitted to act in the place of the trustee to bring a suit under the indenture. *See Revised Model Simplified Indenture,* 38 BUS. LAW. 741, 794 (1983) (describing Section 6.06 as a "no action" clause that limits the security holders' right to sue in the stead of the indenture trustee); *Revised Model Simplified Indenture,* 55 BUS. LAW. 1115, 1191 (2000) (describing Section 6.06 as a "no action" clause that applies to suits brought by indenture noteholders to enforce rights under the indenture that would typically be enforceable by the indenture trustee).

12. Appendix to Opening Br. at A453 (Indenture, Section 9.02) (granting the Issuer and the Trustee the power to amend or supplement the Indenture "with the consent of the Holders of at least a majority in aggregate principal amount of the then outstanding Notes voting as a single class ... subject to Sections 6.04 and 6.07 hereof ...").

read to hold a noteholder liable for the adoption of amendments, because a noteholder who is simply voting on an amendment proposed by the Issuer is not exercising any fiduciary authority.[13]

For the foregoing reasons, there is no reasonable reading of Section 6.06 of the Indenture that supports Caspian's argument that Section 6.06 provided it with a basis to sue its fellow noteholders because those noteholders voted to approve amendments to the Indenture that Caspian disagreed with.[14] Thus, the judgment of the Court of Chancery is AFFIRMED.

---

13. As GS Mezzanine points out, only the Issuer and Trustee owe obligations to the noteholders under Section 9.02 of the Indenture, which addresses amendments to the Indenture, or Section 2.09, which addresses how votes should be counted. *See* Appendix to Opening Br. at A453 (Indenture, Section 9.02); Appendix to Opening Br. at A413 (Indenture, Section 2.09).

14. There are additional grounds that could be cited that support the Court of Chancery's conclusion that Caspian's reading of Section 6.06 of the Indenture is not a reasonable one. Because the grounds we have cited are sufficient to explain why the Court of Chancery was correct, we do not articulate them all.