# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| ELUTIA INC., | ) | |
| | ) | |
| Plaintiff/Counterclaim Defendant, | ) ) ) | |
| | ) | |
| v. | ) | C.A. No. N24C-06-071 PAW CCLD |
| | ) | |
| MEDTRONIC SOFAMOR DANEK USA, INC., | ) ) ) | |
| | ) | |
| Defendant/Counterclaim Plaintiff. | ) ) | |

Submitted: January 9, 2025
Decided: April 8, 2025
Revised: May 28, 2025[1]

*Upon Medtronic Sofamor Danek USA, Inc's Motion to Dismiss*;

**GRANTED, in part and DENIED, in part.**

## <u>MEMORANDUM OPINION AND ORDER</u>

John M. Seaman, Esq.; and Florentina D. Field, Esq., of Abrams & Bayliss, LLP; Evan S. Nadel, Esq.; and Bradley A. Roehrenbeck, Esq., of Kilpatrick, Townsend and Stockton, LLP, *Attorneys for Plaintiff/ Counterclaim Defendant Elutia Inc.*

Todd C. Schiltz, Esq.; Angela Lam, Esq.; and Paul Wolfla, Esq., of Faegre Drinker Biddle & Reath LLP, *Attorneys for Defendant/Counterclaim Plaintiff Medtronic Sofamor Danek USA, Inc.*

**WINSTON, J.**

---

[1] This Memorandum Opinion and Order is revised to reflect the Court's ruling on Elutia Inc.'s Motion for Clarification.

# I. **INTRODUCTION**

Plaintiff Elutia Inc. and Defendant Medtronic Sofamor Danek USA, Inc. entered into a Tissue Product Supply Agreement (the "Supply Agreement").[2] The Supply Agreement details a business arrangement by which Elutia would sell a viable bone matrix product ("FiberCel") to Medtronic who would then distribute it to customers.[3] Elutia alleges Medtronic breached the Supply Agreement through two, independent courses of conduct.[4] First, Elutia claims Medtronic breached Section 5.3 by failing to obtain and maintain general commercial liability insurance.[5] Second, Elutia argues Medtronic breached Section 2.10 by failing to indemnify and defend underlying FiberCel-related lawsuits (the "FiberCel Lawsuits").[6]

Medtronic seeks dismissal of Elutia's claims pursuant to Delaware Superior Court Civil Rule 12(b)(6) (the "Motion").[7] Medtronic argues Elutia's Section 5.3 claim is time-barred[8] and the Section 2.10 claim fails as a matter of law.[9] For the

---

[2] *See* Amended Complaint for Damages (hereafter "Compl.") ¶¶ 1-2, 6.

[3] *Id.* ¶¶ 8-11.

[4] *See id.* ¶¶ 41-54.

[5] *Id.* ¶¶ 41-45; *see* Compl., Ex. A (hereafter "Agreement") § 5.3.

[6] Compl. ¶¶ 46-54; *see* Agreement § 2.10.

[7] Def.'s Op. Br. in Supp. of its Mot. to Dismiss Am. Compl. (hereinafter "Op. Br.") at 1-4, 12-13.

[8] *See id.* at 28-30.

[9] *See id.* at 14-27.

reasons discussed below, Medtronic's Motion is **GRANTED,** in part and **DENIED** in part.

## II. FACTUAL AND PROCEDURAL BACKGROUND[10]

### A. THE PARTIES AND THE SUPPLY AGREEMENT

Elutia develops "biologic products utilized to improve compatibility between medical devices and [] patients."[11] On January 24, 2019, the parties entered into the Supply Agreement by which Elutia agreed to supply Medtronic with FiberCel.[12] Medtronic would then distribute FiberCel "to customers, third parties, and/or end users."[13]

Section 2.10 of the Supply Agreement establishes Medtronic's obligation to defend and indemnify Elutia in certain circumstances.[14] Relevant here are three separate bases for indemnification, which read:

> [1] Medtronic will, at its own expense, defend any third party suit instituted against Supplier that is based on (a) an allegation that any Product was the cause of any personal injury or damage to property [(the "Defense Provision").] . . . [2] Medtronic will indemnify Supplier against any award of damage and costs made against Supplier by a final judgment of a court of last resort with respect to all such suits, provided

---

[10] The facts cited are drawn from Elutia's Amended Complaint and the documents incorporated therein. The Court accepts as true the well-pled facts in the Amended Complaint solely for the purpose of its decision on Medtronic's Motion.

[11] Compl. ¶ 6.

[12] *Id.* ¶¶ 8, 10-11.

[13] *Id.* ¶ 10.

[14] Agreement § 2.10.

that Supplier gives Medtronic prompt notice in writing of all subject claims, permits Medtronic through Medtronic's counsel to defend the same, and gives Medtronic all available information, assistance, and authority to enable Medtronic to assume such defense [(the "Damages Award Provision")]. . . . [3] Medtronic further agrees to indemnify, defend, and hold harmless [Elutia] against and in respect of any and all Losses . . . in each case with respect to a third party claim, arising out of or based upon the material breach by Medtronic of any of its representations, warranties, covenants, or agreements contained or incorporated in this Agreement or the Quality Agreement, except to the extent such Losses . . . [are] caused by Suppliers breach of any of its representations, warranties, covenants, or agreements contained or incorporated in this Agreement or the Quality Agreement. Supplier shall give Medtronic prompt notice in writing of all subject claims, permit Medtronic through Medtronic's counsel to defend the same, and give Medtronic all available information, assistance, and authority to enable Medtronic to assume such defense [(the "Loss Provision")].[15]

"Losses" are defined as "any and all losses, obligations, liabilities, damages, deficiencies, actions, settlements, judgments, costs, and expenses."[16]  The Loss Provision references the parties' contractual representations and warranties, several of which are relevant here.  Specifically, the Amended Complaint[17] cites

---

[15] *Id.*

[16] *Id.* § 2.9.

[17] Compl. ¶ 19.

4

Medtronic's representations in Sections 2.1.2.1,[18] 2.1.2.1.1,[19] 2.1.2.1.3,[20] 2.1.2.1.5,[21] and 2.1.2.2,[22] while the parties' briefing references Elutia's representations in Sections 2.6,[23] 4.1.1,[24] and 5.1.5.[25]

---

[18] "Medtronic will promote, market, and transfer the Products to the Territory. Medtronic will not misrepresent the origin of the Products, including in any way that would cause one to believe that the Products are manufactured or developed by anyone other than [Elutia]. Medtronic will distribute the Products to the Territory together with all warnings and instructions necessary for the proper use of the Products and will not make any warranty, express or implied, on behalf of [Elutia]." Agreement § 2.1.2.1.

[19] Medtronic will "not engage in any fraudulent, deceptive, misleading or unethical conduct, including in the advertisement or promotion of the Products." Agreement § 2.1.2.1.1.

[20] Medtronic will "make no representations, warranties or guarantees to third parties with respect to the Specifications, features or capabilities of the Products that are false or misleading or are inconsistent with any representations, warranties or guaranties regarding the Products that are expressly authorized by [Elutia]." Agreement § 2.1.2.1.3.

[21] Medtronic will ensure its "personnel have a sufficient level of understanding of the Products to provide basic technical information to the potential Customers and to effectively distribute and support the Products." Agreement § 2.1.2.1.5.

[22] "Medtronic will comply with all Applicable Laws in its distribution of the Products and the performance of its obligations under this Agreement. . . . Medtronic will not engage in any course or conduct that, in Supplier's reasonable belief, would cause [Elutia] to be in violation of the Applicable Laws of any jurisdiction. Medtronic will promptly notify [Elutia] upon becoming aware that the Products or any requirements of this Agreement may be in violation of any Applicable Laws." Agreement § 2.1.2.2.

[23] Elutia "warrants that the Products sold hereunder will be free from defects of material and workmanship and will conform to the Specifications and that [Elutia] will comply with all Applicable Law in regards to the services and products [Elutia] is providing herein." Agreement § 2.6.

The Supply Agreement also details the parties' obligation to secure and maintain insurance coverage.[26] Specifically, Section 5.3 states:

> Each party shall secure and maintain in full force and effect through the term of this Agreement commercial general liability insurance coverage of not less than One Million Dollars (US$1,000,000.00) per claim, and Five Million Dollars (US$5,000,000.00) in the aggregate. Before the First Product Shipment Date, each party shall provide an insurance certificate to the other party evidencing such insurance coverage.[27]

It is undisputed that Medtronic did not purchase insurance or provide an insurance certificate but rather chose to self-insure.[28] Conversely, Elutia obtained a compliant insurance policy from Continental Casualty Company, as well as an excess insurance policy.[29]

---

[24] Elutia "shall establish and maintain a quality system which is appropriate for the activities that Supplier is responsible under this Agreement and which is in compliance with current American Association of Tissue Banks ("AATB") Standards for Tissue Banking, 21 CFR Part 1271.160 and all Applicable Laws." Agreement § 4.1.1.

[25] Elutia "is a human tissue processor which is AATB accredited that maintains a Quality Management System which is in compliance with 21 CFR Part 1721.150 and all Applicable Law." Agreement § 5.1.5.

[26] Agreement § 5.3.

[27] *Id*.

[28] Compl. ¶¶ 25-26.

[29] *Id.* ¶ 2.

6

## B.    THE FIBERCEL LAWSUITS AND THE PARTIES' DISPUTE

In June 2021, Elutia recalled a single lot of FiberCel containing 154 units.[30] Elutia had supplied all 154 units to Medtronic, who distributed 136 units which were implanted into 113 patients.[31]  Beginning in September 2021, patients that received the recalled FiberCel brought over 100 FiberCel Lawsuits.[32]  These suits asserted a variety of claims, and generally alleged patients were exposed to and contracted tuberculosis, or suffered complications following implantation of the recalled FiberCel.[33]  Medtronic and Elutia are co-defendants in many of the FiberCel Lawsuits.[34]  As a defendant, "Medtronic received prompt written notice of each of the FiberCel Lawsuits," via service of process "shortly after the filing of each suit."[35]

---

[30] *Id*. ¶¶ 12, 15.

[31] *Id*. ¶¶ 13-14.

[32] *Id*. ¶ 15.

[33] *Id*. ¶¶ 16, 18.

[34] *Id*. ¶¶ 18-19, 36-37.  The Amended Complaint references one suit, *Aspinall v. Aziyo Biologics, Inc., et al.*, C.A. No. N21C-09-065 DJB (the "*Aspinall* Compl."), which "alleged that the defendants—including Medtronic—'failed to exercise reasonable care in the designing, researching, manufacturing, marketing, supplying, promoting, sale, testing, quality assurance, quality control and distribution of FiberCel' and 'were negligent in the designing, researching, supplying, manufacturing, promoting, packaging, distributing, testing, advertising, warning, marketing and sale of FiberCel.'"  Compl. ¶ 19.

[35] Compl. ¶ 36.

As a named party in many of the FiberCel Lawsuits, Medtronic could defend each suit through its selected counsel.[36] After the initial FiberCel Lawsuit was filed, Elutia's insurer determined that Medtronic potentially qualified as an insured under Elutia's Policy.[37] Accordingly, the parties agreed to be jointly represented by the law firm Elutia's insurer retained.[38] Elutia informed Medtronic that Elutia reserved its right to seek contribution or indemnification from Medtronic pursuant to Section 2.10 of the Agreement.[39] As part of the joint defense, Elutia provided Medtronic with information and assistance towards the defense of the suits,[40] and regular updates on all FiberCel Lawsuits, including the few actions in which Medtronic was not a party.[41] Elutia alleges, Medtronic had equal control over their joint defense.[42]

Both Elutia and Medtronic denied the plaintiffs' allegations in the FiberCel Lawsuits, none of which have resulted in a final judgment.[43] Several FiberCel Lawsuits, however, have settled.[44] At present, Elutia's insurers have expended over

---

[36] *Id.* ¶ 37.

[37] *Id.* ¶ 27 (internal quotation omitted).

[38] *Id.* ¶¶ 28, 37.

[39] *Id.*

[40] Compl. ¶ 38.

[41] *Id.* ¶ 36.

[42] *Id.* ¶ 38.

[43] *Id.* ¶¶ 20-21.

[44] *Id.* ¶¶ 7, 30-32.

$17 million to defend and settle FiberCel Lawsuits on behalf of both Elutia and Medtronic, with a significant portion attributable to the cost to defend and settle claims in the FiberCel Lawsuits against Medtronic.[45]

Once Elutia realized it was nearing exhaustion of its insurance coverage limits, it requested Medtronic contribute to defense costs and commit to future indemnity.[46] This prompted Medtronic to retain separate counsel in the FiberCel Lawsuits.[47] Elutia then filed this action.[48] The parties also tolled the applicable limitations periods on their respective legal claims.[49]

### C. PROCEDURAL HISTORY

Elutia initiated this action on June 7, 2024. After Medtronic moved for judgment on the pleadings, Elutia amended its complaint. In response, Medtronic filed the instant Motion and Elutia opposed. After Medtronic filed its reply brief, this Court heard oral argument and reserved its decision.

## III. STANDARD OF REVIEW

On a Rule 12(b)(6) motion to dismiss, the Court: (i) accepts all well-pleaded factual allegations as true; (ii) credits vague allegations if they give the opposing

---

[45] *Id.* ¶ 30.

[46] *Id.* ¶¶ 30-31, 37-40.

[47] *Id.* ¶ 39.

[48] *Id.*

[49] *Id.*

party notice of the claim; (iii) draws all reasonable inferences for the non-moving party; and (iv) denies dismissal if recovery on the claim is reasonably conceivable.[50] The Court does not, however, accept conclusory allegations unsupported by the facts or draw unreasonable inferences in favor of the nonmovant.[51]

## IV.  ANALYSIS

Elutia asserts two breach of contract claims against Medtronic.[52]  Count I alleges "Breach of Contract – insurance Coverage Requirement" based on Section 5.3.[53]  Count II alleges "Breach of Contract – Failure to Indemnify" based on Section 2.10.[54]  Medtronic seeks dismissal of both counts under Rule 12(b)(6).  For a breach of contract claim to survive a motion to dismiss, "the plaintiff must demonstrate: first, the existence of the contract, whether express or implied; second, the breach of an obligation imposed by that contract; and third, the resultant damage to the plaintiff."[55]  Dismissal of a claim "based on contract interpretation is proper 'if the

---

[50] *Cent. Mortg. Co. v. Morgan Stanley Mortg. Cap. Holdings, LLC*, 27 A.3d 531, 535 (Del. 2011).

[51] *Windsor I, LLC v. CWCapital Asset Mgmt. LLC*, 238 A.3d 863, 871 (Del. 2020).

[52] *See generally* Compl.

[53] *Id*. ¶¶ 41-45.

[54] *Id*. ¶¶ 46-54.

[55] *VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 612 (Del. 2003).

defendants' interpretation is the *only* reasonable construction as a matter of law.'"[56]

The Court addresses each Count in turn.

### A. COUNT I IS TIME-BARRED.

Section 5.3 requires each party to "secure and maintain . . . through the term of this Agreement . . . insurance coverage of not less than One Million Dollars [] per claim, and Five Million Dollars [] in the aggregate."[57] Additionally, both parties had to "provide an insurance certificate to the other party evidencing such insurance coverage," before the first FiberCel shipment.[58] Medtronic did not purchase insurance or provide an insurance certificate.[59] Thus, Medtronic's sole argument regarding Section 5.3, is that Elutia's claim for breach of the insurance provision is time-barred.[60]

---

[56] *Caspian Alpha Long Credit Fund, L.P. v. GS Mezzanine Partners 2006, L.P.*, 93 A.3d 1203, 1205 (Del. 2014) (quoting *Vanderbilt Income & Growth Assocs., LLC v. Arvida/JMB Managers, Inc.*, 691 A.2d 609, 613 (Del. 1996) (emphasis in original)).

[57] Agreement § 5.3.

[58] *Id*.

[59] Compl. ¶¶ 25-26.

[60] Op. Br. at 28-30. "A motion to dismiss is the proper vehicle for a statute of limitations defense where the pleading itself demonstrates that the claim was brought after the statutory period has run." *Adames v. Adames*, 2020 WL 3027240, at *1 (Del. Super. June 5, 2020) (citations omitted).

The statute of limitations for a breach of contract claim is three years.[61] The Supply Agreement became effective January 24, 2019.[62] The parties executed a tolling agreement on January 29, 2024, "to toll the applicable limitations period on their respective legal claims."[63] Therefore, the question before the Court is when Elutia's cause of action under Section 5.3 arose.

Medtronic contends any cause of action under Section 5.3 arose in January 2019, when the Supply Agreement became effective.[64] Because the Supply Agreement "required Medtronic to procure insurance from the outset of the contract,"[65] any breach of Section 5.3 occurred "the moment the contract took effect."[66] The Supply Agreement became effective in 2019, and the parties did not enter the tolling agreement until 2024.[67] Accordingly, Medtronic contends Count I is time-barred.[68]

---

[61] 10 *Del. C.* § 8106(a).

[62] Compl. ¶ 8.

[63] Compl. ¶ 39; *see* Pl.'s Br. in Opp. to Def.'s Mot. to Dismiss Am. Compl. (hereinafter "Ans. Br."), Ex. 2.

[64] Op. Br. at 28-30.

[65] *Id.* at 28-29.

[66] *Id.* at 29.

[67] *Id*. at 29-30.

[68] *Id*. at 29-30.

Elutia rejects Medtronic's argument because the Supply Agreement's "insurance obligations are continuous in nature under Section 5.3's plain terms."[69] Thus, under the "continuous breach doctrine, a new claim accrued every day that Medtronic failed to comply with its insurance obligations."[70] Elutia contends the continuous breach doctrine also applies because it could not have ascertained or recovered damages from Medtronic's failure when the Supply Agreement began.[71] Because Elutia could not ascertain damages until the FiberCel Lawsuits were filed, Elutia's claim did not accrue until a date within the limitations period.[72] Accordingly, Count I's timeliness hinges on the continuing breach doctrine's applicability.

The continuing breach doctrine is a narrow exception which applies "only when there is a continuing injury whose damages cannot be determined until the cessation of the wrong."[73] Importantly, the doctrine does not apply "if the aggrieved party could have alleged a *prima facie* case for breach of contract . . . after a single

---

[69] Ans. Br. at 8-9.

[70] *Id*. at 9-13.

[71] *Id*. at 13-15.

[72] *Id*. at 13-14.

[73] *Vivint Solar, Inc. v. Lundberg*, 2024 WL 2755380, at *27 (Del. Ch. May 30, 2024) (citations omitted), *aff'd*, 2025 WL 855020 (Del. Mar. 19, 2025).

incident."[74]   This is true even if the aggrieved party alleges numerous repeated wrongs of similar, if not the same, character over an extended period.[75]

Based on the continuing breach doctrine, Medtronic's failure to obtain and maintain insurance coverage is not a continuing breach.  Elutia could have alleged a prima facie case for breach of Section 5.3 on the Agreement's effective date— January 24, 2019—when Medtronic failed to secure insurance.[76]  Therefore, while Section 5.3 imposed an ongoing obligation to maintain coverage, that alone does not

---

[74] *Id.* at *27 (quoting *AM Gen. Hldgs. LLC v. The Renco Gp., Inc.*, 2016 WL 4440476, at *12 (Del. Ch. Aug. 22, 2016)).

[75] *Id.*

[76] Compl. ¶ 25 ("Medtronic has admitted that it did not procure any potentially applicable insurance policy at any time pursuant to the Supply Agreement[.]").  Elutia makes a passing argument that its breach cause of action first arose when it "shipped the products to Medtronic" because Medtronic never provided an insurance certificate as required by Section 5.3.  Def.'s Reply Br. in Supp. of its Mot. to Dismiss Pl.'s Am. Compl. (hereinafter "Reply Br.") at 17-18; *see* Compl. ¶ 26.  That argument, however, is inconsistent with both the Supply Agreement's text and the Amended Complaint's allegations.  Section 5.3 required Medtronic to "secure" insurance coverage by the Supply Agreement's effective date.  Agreement § 5.3.  As discussed, Medtronic's failure to obtain compliant insurance gave Elutia a prima facie breach claim when the Supply Agreement became effective, independent of any obligation to provide an insurance certificate.  *See* Compl. ¶ 25 ("Medtronic has admitted that it did not procure any potentially applicable insurance policy at any time pursuant to the Supply Agreement[.]").  This comports with the Amended Complaint's allegations which specifically challenge Medtronic's failure "to secure and maintain in full force and effect through the term of the Supply Agreement commercial general liability insurance[,]" not Medtronic's non-provision of an insurance certificate.  *Id.* ¶ 44; *see id.* ¶¶ 41-45 (allegations concerning Elutia's Section 5.3 claim, which do not mention the insurance certificate).  Accordingly, Elutia's insurance certificate argument does not alter the statute of limitations analysis.

mandate application of the continuing breach doctrine.[77]  Moreover, contrary to Elutia's assertion,[78] damages could be ascertained at the time of breach.[79]  Elutia seeks "not less than five million dollars" for Medtronic's alleged breach of the insurance provision.[80]  That figure is drawn directly from Section 5.3's minimum aggregate insurance coverage.[81]  Hence, Elutia could have brought the same claim seeking $5 million when the Supply Agreement became effective.[82]  Thus, the continuing breach doctrine is inapplicable, and Count I is time-barred.  Medtronic's Motion to Dismiss Count I is **GRANTED** and Elutia's claim for breach of Section 5.3 regarding Medtronic's failure to secure insurance is dismissed with prejudice.

---

[77] *Vivint Solar*, 2024 WL 2755380, at *27.

[78] Ans. Br. at 13-15.

[79] Medtronic argues that whether Elutia could ascertain its damages is irrelevant given the Supreme Court of Delaware's recent holding that, "[a] breach-of-contract claim 'accrues and the Statute begins to run at the time the contract is broken, not at the time when actual damage results or is ascertained.'" *Lehman Brothers Holdings, Inc. v. Kee*, 268 A.3d 178, 185-86 (Del. 2021) (quoting *Worrel v. Farmers Bank of State*, 430 A.2d 469, 472 (Del. 1981)).  That decision did not address the continuing breach doctrine, but recognized "the limitations period can be tolled in certain circumstances."  *Id.* (internal quotations omitted).  The Court need not address Medtronic's argument because Elutia could reasonably ascertain its damages when its cause of action under Section 5.3 first accrued.

[80] Compl. ¶ 45.

[81] *See id.* ¶ 44; Agreement § 5.3.

[82] *Donald M. Durkin Contracting, Inc. v. City of Newark*, 2020 WL 5797622, at *13 (Del. Super. Sept. 29, 2020) ("holding that "[p]laintiff could have brought the same claim after the Defendant's refusal that Plaintiff now raises in the instant case.  As such, the continuing claim or continuing breach doctrine is not applicable to Plaintiff's claim.").

## B. ELUTIA STATES A CLAIM FOR BREACH OF SECTION 2.10.

Section 2.10 of the Supply Agreement details Medtronic's obligation to defend and indemnify Elutia.[83] Elutia asserts it is owed indemnification under three separate clauses of Section 2.10—the Defense Provision, the Damages Award Provision, and the Loss Provision.[84] At the outset, Medtronic contends Count II fails because the Amended Complaint does not allege that Elutia complied with Section 2.10's three "conditions precedent."[85] Those conditions include:

> (1) Elutia give Medtronic prompt written notice of each FiberCel Lawsuit as to which it asserted indemnity rights, (2) Elutia permit Medtronic, through Medtronic's counsel, to defend the suit against Elutia, and (3) Elutia provide Medtronic with all available information, assistance and authority so Medtronic can assume (and perform) the defense.[86]

Additionally, Medtronic argues Elutia fails to state a claim for breach of any part of Section 2.10.[87] The Court addresses each contention in turn.

---

[83] Agreement § 2.10; *see supra* n.14 and accompanying text (providing the text of the three relevant clauses of § 2.10).

[84] *See* Compl. ¶¶ 33-35, 46-54.

[85] Op. Br. at 22, 25.

[86] *Id*. at 21 (citing Agreement § 2.10). A condition precedent is an "act or event, other than a lapse of time, that must exist or occur before a duty to perform something promised arises." *Thomas v. Headlands Tech Principal Holdings, L.P.*, 2020 WL 5946962, at *5 (Del. Super. Sept. 22, 2020) (citations omitted). Accordingly, any phrase that conditions performance suffices, to create a condition precedent. *Id.* (citation omitted).

[87] Op. Br. at 14-27.

### 1. THE COMPLAINT SUFFICIENTLY ALLEGES ELUTIA COMPLIED WITH THE CONDITIONS PRECEDENT.

Medtronic argues its indemnification obligation was not triggered because Elutia failed to comply with Section 2.10's three conditions.[88] Elutia responds contending, among other things, it adequately alleged that all conditions have been met.[89] As explained above, the pleading standard governing a motion to dismiss is minimal. At this stage, the Court will not consider whether the conditions were performed as a matter of fact.[90] Rather, the question is whether Elutia's well-pleaded Amended Complaint generally alleges compliance with the conditions precedent.[91] Here, Elutia pled that it met all of its obligations under the Agreement.[92] Thus, the

---

[88] Op. Br. at 20-22. The Court notes that while indemnification under the Damages Award Provision and Loss Provision is expressly tied to satisfaction of the conditions, the Defense Provision contains no such textual requirement. Whether Medtronic's indemnification obligation under the Defense Provision is nevertheless based on Elutia's satisfaction of the conditions remains in dispute and is addressed later in the memo. *See infra*, IV.B.2.

[89] Ans. Br. at 26-31.

[90] *Cent. Mortg.*, 27 A.3d at 538.

[91] *Id*. *See also*, Super. Ct. R. 9(c) ("In pleading the performance or occurrence of conditions precedent, it is sufficient to aver generally that all conditions precent have been performed or have occurred."); *Eisemann Corp. v. General Motors Corp.*, 2000 WL 140781, at *18 (Del. Super. Jan. 28, 2000) (denying defendant's motion to dismiss based on plaintiff's failure to plead that specific conditions precedent were satisfied because plaintiff alleged complete performance generally.).

[92] Elutia generally alleges that it "has performed and continues to perform all conditions, covenants, and promises required on its part to be performed in accordance with the terms and conditions of the [] Agreement." Compl. ¶ 48. The Amended Complaint also contains allegations giving rise to a reasonable inference

17

Amended Complaint sufficiently alleges Elutia performed Section 2.10's conditions precedent, which is enough to survive a motion to dismiss.

## 2. ELUTIA STATES A CLAIM FOR BREACH OF SECTION 2.10'S DEFENSE PROVISION.

The Court next addresses Medtronic's contention that the Amended Complaint fails to state a claim for breach of Section 2.10.'s Defense Provision. Medtronic contends the conditions precedent apply to the Defense Provision.[93] However, the Defense Provision does not set forth the conditions precedent. Instead, they are listed in the following sentence—the Damages Award Provision. The provisions at issue provide:

> [1] Medtronic will, at its own expense, defend any third party suit instituted against Supplier that is based on (a) an allegation that any Product was the cause of any personal injury or damage to property [Defense Provision] . . . [2] Medtronic will indemnify Supplier against

---

that Elutia complied with each individual condition precedent. Regarding the need to provide notice, the Amended Complaint alleges "Medtronic received prompt written notice of each of the FiberCel Lawsuits . . . as a [named] defendant in almost all the FiberCel Lawsuits . . . [and] [j]oint defense counsel provided Medtronic with regular updates on all FiberCel Lawsuits. *Id.* ¶ 36. Concerning the ability to choose counsel and control the defense, the Amended Complaint alleges "Medtronic was permitted the opportunity to defend each of the FiberCel Lawsuits through its chosen counsel. Medtronic elected to be defended by the law firm of Bowman & Brooke LLP, as did Elutia." *Id.* ¶ 37. Finally, regarding Elutia's obligation to assist Medtronic in its defense of the FiberCel Lawsuits, the Amended Complaint alleges "Elutia and Medtronic were jointly defended in the suits, and Elutia provided Medtronic with all available information and assistance towards the defense of the suits. Medtronic had equal control with Elutia over their joint defense of the FiberCel Lawsuits." *Id.* ¶ 38.

[93] *See* Op. Br. at 20-21; Reply Br. at 4-7.

any award of damage and costs made against Supplier by a final judgment of a court of last resort with respect to all such suits, provided that Supplier gives Medtronic prompt notice in writing of all subject claims, permits Medtronic through Medtronic's counsel to defend the same, and gives Medtronic all available information, assistance, and authority to enable Medtronic to assume such defense [Damages Award Provision].

Medtronic contends these provisions make clear that Elutia must satisfy the conditions in the second sentence to trigger Medtronic's defense duties for the type of claim described in the first sentence.[94] Specifically, the only reasonable interpretation of the two sentences is that "all such suits" in the second sentence must refer back to "third party suit" in the first sentence.[95] Elutia argues that reading the two sentences together adds atextual requirements to the Defense Provision.[96] In support of its position, Elutia notes only the Damages Award Provision and Loss Provision expressly include conditions precedent, the Defense Provision does not.[97]

Although contractual interpretation is a question of law and suitable for determination on a motion to dismiss, the Court cannot choose between two differing reasonable interpretations of ambiguous provisions.[98] Dismissal is only proper if

---

[94] Reply Br. at 5.

[95] *Id*.

[96] Ans. Br. at 17.

[97] *Id*.

[98] *VLIW Tech.*, 840 A.2d at 615 (opining that on a motion to dismiss, a court cannot choose between reasonable interpretations).

19

Medtronic's interpretation is the only reasonable interpretation.[99]   Here, both interpretations are reasonable; therefore, it is premature for the Court to decide whether the conditions precedent apply to the Defense Provision.  Separately, and in addition, even if Medtronic's interpretation was the only reasonable construction, dismissal would be unwarranted because Elutia sufficiently pled compliance with its contractual obligations.[100]   Accordingly, the Motion is **DENIED** regarding the Defense Provision portion of Count II.

### 3. ELUTIA DOES NOT STATE A CLAIM FOR BREACH OF SECTION 2.10'S DAMAGES AWARD PROVISION.

Turning to the Damages Provision, Medtronic contends the plain text "obligates Medtronic to indemnify Elutia not for settlements but for awards of damages and costs issued by a court of last resort."[101]   While the Amended Complaint seeks indemnity "against the . . . judgments in the underlying" suits,[102] Medtronic contends that request fails because there have been no final judgments in any of the FiberCel Lawsuits.[103]

---

[99] *Caspian Alpha*, 93 A.3d at 1205.

[100] *See supra*, IV.B.1.

[101] Op. Br. at 15.

[102] Compl. ¶ 7.

[103] Op. Br. at 18-19 (citing Compl. ¶ 21).

Elutia does not dispute the lack of any final judgments in the FiberCel Lawsuits.[104] Instead, Elutia argues the absence of judgments against it does not abrogate Medtronic's breach of the Damages Award Provision, because Medtronic's repudiation of its indemnification obligations is a breach.[105] Elutia maintains the Amended Complaint alleges Medtronic repeatedly repudiated its indemnification obligations, which constitutes breach.[106] That position, however, is factually untethered.

To sustain an anticipatory repudiation breach claim, a complaint must allege the promisor gave an unequivocal, positive, and unconditional statement about the promisor's intent not to perform the contractual obligation.[107] The Amended Complaint does not use the word "repudiate," or contain any allegation that Medtronic told Elutia it would never indemnify pursuant to the Damages Award Provision.[108] Similarly, at oral argument Elutia's counsel was unable to point to any fact in the Amended Complaint demonstrating that Medtronic stated it would never

---

[104] Ans. Br. at 19-22.

[105] Ans. Br. at 19-20.

[106] *Id*. at 21-22 (citing Compl. ¶ 40). "Elutia has made numerous requests to Medtronic to honor the terms of the Medtronic Indemnity and contribute to the costs of defending the FiberCel Lawsuits. . . . To date, however, Medtronic has failed and refused to honor its indemnity obligations." Compl. ¶ 40.

[107] *Veloric v. J.G. Wentworth, Inc.*, 2014 WL 4639217, at *15 (Del. Ch. Sept. 18, 2014) (citations omitted).

[108] *See generally* Compl.

perform under the Damages Award Provision. The closest the Amended Complaint comes to alleging anticipatory repudiation is its allegation that, "Medtronic has failed and refused to honor its indemnity obligations."[109] Yet, the parties' correspondence demonstrates that when Elutia made its indemnification request,[110] Medtronic did not refuse to indemnify under any circumstance.[111] Instead, Medtronic asserted Elutia failed to satisfy conditions precedent to Medtronic's duty to defend and Elutia was not entitled to indemnification under Delaware law.[112] Contrary to Elutia's contention, Medtronic was pointing out that the triggering events that could give rise to a duty to indemnify had not occurred. Thus, the Amended Complaint's allegations do not create a reasonable inference that Medtronic anticipatorily repudiated its obligations to indemnify under the Supply Agreement. The Motion regarding the Damages Provision portion of Count II is

---

[109] *Id.* ¶ 40.

[110] *See* Def.'s Answer and Defenses to Pl.'s Compl. and Counterclaim (hereafter "Counterclaim"), Ex. 3 (showing the October 25, 2023, email in which Elutia requested indemnification for the FiberCel Lawsuits from Medtronic). *See also Furman v. Delaware Dept. of Trans.*, 30 A.3d 771, 774 (Del. 2011) (holding that on a motion to dismiss, the Court may consider documents incorporated by reference that are integral to a plaintiff's claim). The exhibits to the Counterclaim are integral to Elutia's claim and referenced in the Amended Complaint. *See* Compl. ¶ 40 ("Elutia has made numerous requests to Medtronic to honor the terms of the Medtronic Indemnity . . . .").

[111] *See* Counterclaim, Ex. 4.

[112] *Id.* at 1 (emphasis added).

**GRANTED** and Elutia's claim for breach of Section 2.10's Damages Award Provision is dismissed without prejudice.

### 4. ELUTIA STATES A CLAIM FOR BREACH OF SECTION 2.10'S LOSS PROVISION.

The Motion's final argument is that the Amended Complaint fails to state a claim for breach of the Loss Provision.[113] Given the nuance of the parties' arguments concerning the Loss Provision, the Court first outlines their positions before addressing the merits.

#### a. THE PARTIES' ARGUMENTS

Medtronic concedes that the Loss Provision requires it to indemnify Elutia for settlement costs in some instances.[114] That indemnity obligation only applies to settlements that resolve a third-party claim against Elutia that arises out of or is based upon a material breach by Medtronic of any of its representations contained or incorporated in the Supply Agreement.[115] Medtronic argues the Amended Complaint "fail[s] to connect any claim against [Elutia] in the FiberCel Lawsuits to an alleged material breach of a Medtronic Supply Agreement representation."[116] Medtronic maintains the representations Elutia cites in the Amended Complaint, do not cover

---

[113] Op. Br. at 15-27.

[114] *Id.* at 15; *see* Agreement §§ 2.9 (providing the definition of "Losses"), 2.10.

[115] Op. Br. at 15 (quoting Agreement § 2.10).

[116] *Id.* at 16.

the acts challenged in the FiberCel Lawsuits—that FiberCel was contaminated with tuberculosis and unsafe.[117]  Additionally, Medtronic argues public policy supports the position that no indemnification is owed under Section 2.10, as Elutia's losses arise from its own wrongful acts.[118]  Because "no language in Section 2.10 clearly and unequivocally states that negligence or fault-based claims against Elutia are indemnifiable," Medtronic argues the Court should not interpret the Loss Provision to insulate Elutia from its own negligence.[119]

Elutia posits that "allegations and arguments in the FiberCel Lawsuits, if true, would constitute a material breach of Medtronic's representations . . . in the Supply Agreement."[120]  Elutia cites the *Aspinall* complaint as demonstrating that Medtronic was more than a mere distributor without other involvement, in the wrongful conduct challenged by the FiberCel Lawsuits.[121]  Elutia's brief maps the actions challenged in *Aspinall*, onto Medtronic's contractual representations.[122]  Elutia also reject's Medtronic's public policy argument.[123]  First, Elutia notes the FiberCel Lawsuits

---

[117] *Id*. at 16-17.

[118] *Id.* at 25-27.

[119] *Id*. at 26.

[120] Compl. ¶ 19; *see also*, Ans. Br. at 23.

[121] Ans. Br. at 23-26 (citing *Aspinall* Compl. ¶¶ 38, 40, 53).

[122] *Id.* at 25-26.

[123] *Id*. at 31-35.

named both Elutia and Medtronic as defendants, hence the argument that only Elutia's actions were at issue is incorrect.[124] Second, Elutia notes none of the FiberCel Lawsuits resulted in a finding that Elutia was negligent, so Medtronic's position is factually attenuated.[125] Finally, Elutia maintains that even if the indemnity obligations arose out of Elutia's wrongful conduct, Medtronic must indemnify Elutia because Section 2.10's plain text shows the parties intended such a result.[126]

### b. THE COURT'S ANALYSIS

As the parties' briefing makes clear, whether Elutia states a claim for breach of the Loss Provision depends on resolution of two questions. First, does the Amended Complaint allege the FiberCel Lawsuits challenged actions which implicate Medtronic's representations in the Supply Agreement. Second, if Elutia has an indemnification claim, should the Court nevertheless abrogate that contractual right on public policy grounds.

To the first question, the Amended Complaint references specific Medtronic representations Elutia alleges would be breached, if the FiberCel Lawsuits'

---

[124] *Id*. at 31-32.

[125] *Id*. at 33 (citing Compl. ¶¶ 20-21).

[126] *Id*. at 33-35.

contentions are true.[127] While there are "over 100" FiberCel Lawsuits, the parties only attached the *Aspinall* complaint to the pleadings. Accordingly, there appears to be at least a factual question, unsuited for resolution on a motion to dismiss, regarding whether the other FiberCel Lawsuits challenged actions that would breach Medtronic's representations.[128] Considering the *Aspinall* complaint alone, Medtronic has not demonstrated the only plausible reading is that it challenges actions outside Medtronic's Supply Agreement representations. For example, "Medtronic's alleged negligence in distributing, advertising, warning, marketing and sale of FiberCel,"[129] could fall within Section 2.1.2.1.[130] Accordingly, the Amended Complaint alleges the FiberCel Lawsuits challenged Medtronic actions that, if true, would breach Medtronic's representations in the Supply Agreement. Thus, the portion of Count II dealing with the Loss Provision is not excludable on that basis.

To the second relevant question, Medtronic is correct that contracts relieving a party of its own negligence are disfavored.[131] "While a contract for

---

[127] Compl. ¶ 19.

[128] While the Amended Complaint alleges the FiberCel Lawsuit made the same general allegations, it also notes they were filed in multiple courts and asserted different causes of action. Compl. ¶¶ 16-18.

[129] Ans. Br. at 25 (citing *Aspinall* Compl. ¶¶ 38, 53).

[130] *See* Agreement § 2.1.2.1 (requiring Medtronic to distribute FiberCel "together with all warnings and instructions necessary for the proper use.").

[131] *Waller v. J. E. Brenneman Co.*, 307 A.2d 550, 551-52 (Del. Super. 1973) (citation omitted)).

indemnification may provide for indemnification for the indemnitee's own negligence, that intention must be evidenced by unequivocal language."[132] Without a "crystal clear and unequivocal" statement that an indemnification provision is intended to insulate a party from its own negligence, the Court will not interpret it as such.[133] Section 2.10 does not meet that standard. Indeed, the text suggests the opposite. The Loss Provision limits Medtronic's indemnity obligation "to the extent [] Losses are due to [Elutia's] gross negligence or intentional misconduct or to the extent caused by [Elutia's] breach of any of its representations" in the Supply Agreement.[134] Thus, Section 2.10 does not require Medtronic to indemnify Elutia's own misconduct.

That fact, however, does not mandate granting Medtronic's Motion. The Amended Complaint alleges the FiberCel Lawsuits challenged some conduct attributable to Medtronic. If those allegations prove true, a portion of Elutia's Loss would not be based on its own actions. Thus, that Section 2.10 prohibits Elutia from recovering for its own wrongful conduct, does not bar its claims. Accordingly,

---

[132] *American Ins. Group v. Risk Enterprise Management, Ltd.*, 761 A.2d 826, 829 (Del. 2000).

[133] *Clemmons v. Whiting-Turner Contracting Co.*, 2000 WL 33113924, at \*2 (Del. Super. Oct. 31, 2000) (citing *Jordan v. State v. Interstate Amiesite Corp.*, 297 A.2d 41, 44-45 (Del. 1972)).

[134] Agreement § 2.10.

public policy does not provide a basis for dismissing Count II. The Court **DENIES** the Motion regarding the Loss Provision portion of Count II.

## V.     CONCLUSION

For the foregoing reasons, Medtronic's Motion to Dismiss is **GRANTED,** in part and **DENIED,** in part.

**IT IS SO ORDERED.**

*/s/ Patricia A. Winston*
**Patricia A. Winston, Judge**